## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

ASSOCIATION OF AMERICAN RAILROADS,

                      Plaintiff,

     v.

BOB JACOBSON,
   *Commissioner of the Minnesota*
   *Department of Public Safety*,

PAUL MARQUART,
   *Commissioner of the Minnesota*
   *Department of Revenue*, and

KEITH ELLISON,
   *Attorney General of Minnesota*

in their official capacities,

                    Defendants.

Civil Action No. _____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Association of American Railroads ("AAR") alleges:

### INTRODUCTION

1.     Congress has long exercised broad regulatory authority over rail transportation.  The ICC Termination Act ("ICCTA") vests the federal government with "exclusive" jurisdiction over "transportation by rail carriers," and expressly preempts state legislation that would manage, govern, burden, interfere with, or discriminate against rail transportation.  49 U.S.C. § 10501(b).  Similarly, the Hazardous Materials Transportation Act ("HMTA") prohibits States from imposing fees on rail shipments of hazardous

materials unless they are "fair"—meaning the fees must be imposed equally on *all* modes of transportation (including rail, trucks, ships, and barges).  And the Railroad Revitalization and Regulatory Reform Act ("4-R Act") similarly bars States from enforcing tax schemes that target railroads for disfavored treatment.

2.      In violation of this comprehensive federal scheme, Minnesota has enacted legislation requiring that railroads, including AAR's members, pay 70% of an annual $4 million assessment—amounting to $2.8 million—into a state account used in part to fund training and equipment for responding to hazardous material incidents.  *See* Minn. Stat. § 299A.55, subd. 4 (the "Special Assessment").  That charge is uniquely imposed on railroads.  Pipeline companies must pay only a fraction (the remaining 30% of the $4 million assessment, or $1.2 million) of the fees imposed on railroads.  And companies that move hazardous materials by truck, ship, or barge pay nothing at all.

3.      Minnesota's Special Assessment is preempted by federal law.  The Special Assessment is preempted by ICCTA because it discriminates against rail transportation and places a significant and undue burden on railroads.  The Special Assessment is also preempted by the HMTA because the charge is not "fair":  It is assessed only against railroads and not against competing modes of transportation, and railroads must pay even if they carry small amounts of hazardous materials—or even none at all.  In the alternative, if the Special Assessment is deemed a tax, it is preempted by the 4-R Act because it discriminates against rail transportation.

4.      The Court should declare the Special Assessment preempted by ICCTA, the HMTA, or alternatively, the 4-R Act, and enjoin Defendants from enforcing the law.

## PARTIES

5.     Plaintiff Association of American Railroads is a nonprofit trade association whose members include all of the Class I freight railroads (North America's largest freight railroads), smaller freight railroads, and passenger and commuter railroads.   AAR's members operate approximately 83 percent of the line-haul mileage, employ 95 percent of the workers, and account for 97 percent of the freight revenues of all railroads in the United States.   AAR and its members are committed to operating the safest, most efficient, cost-effective, and environmentally sound freight rail transportation system in the world.   AAR represents its member railroads in proceedings before Congress, administrative agencies, and the courts in matters of common interest, such as the issues involved in this lawsuit. AAR members, including BNSF Railway Company ("BNSF"), Canadian National Railway ("CN") through its subsidiary Wisconsin Central Ltd., Canadian Pacific Kansas City ("CPKC") through its subsidiary Soo Line Railroad Company, and Union Pacific Railroad ("UP"), operate in Minnesota.

6.     Defendant Bob Jacobson is the Commissioner of the Minnesota Department of Public Safety ("DPS").  He has primary authority to annually assess the fees imposed by the Special Assessment.  Commissioner Jacobson is sued in his official capacity.

7.     Defendant Paul Marquart is the Commissioner of the Minnesota Department of Revenue.  He has authority to enforce the Special Assessment by undertaking collection actions to recover debts owed to DPS.  Commissioner Marquart is sued in his official capacity.

8.      Defendant Keith Ellison is the Attorney General of Minnesota.  He has authority to enforce the Special Assessment by bringing an action in state court to recover debts owed to DPS.  Attorney General Ellison is sued in his official capacity.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction under 28 U.S.C. § 1331 because this case arises under the Constitution and laws of the United States, and raises substantial questions of federal law, including whether federal law preempts the Special Assessment.

10.     If the Special Assessment is deemed a tax, then this Court has jurisdiction under 49 U.S.C. § 11501(c).  That provision confers jurisdiction on federal courts to "prevent a violation" of the 4-R Act notwithstanding the Tax Injunction Act, 28 U.S.C. § 1341, which generally prohibits federal courts from enjoining the collection of state taxes when a plain, speedy, and effective remedy may be had in state court.

11.     This Court may declare the legal rights and obligations of the parties in this action under 28 U.S.C. §§ 2201 and 2202 because this action presents an actual controversy within the Court's jurisdiction.

12.     Venue is proper in this district under 28 U.S.C. § 1391(b), because all Defendants reside in the District of Minnesota and maintain offices in this District in their official capacities, and because a substantial part of the events and omissions giving rise to AAR's claims occurred in the District of Minnesota.

13.     This Court has personal jurisdiction over Defendants because they are domiciled in Minnesota.

14.     AAR has associational standing to bring this suit on behalf of its members because at least one of those members, including BNSF, CN, CPKC, and UP, is directly and adversely affected by the Special Assessment and thus would have standing to sue in its own right.  The interests that AAR seeks to protect through this lawsuit are germane to the organization's purpose, and neither the claims asserted nor the relief requested requires an individual member of AAR to participate in this suit.

## FACTS

**A.     Freight Railroads Safely And Efficiently Transport Hazardous Materials As Part Of An Interconnected National Transportation Network.**

15.     AAR's freight railroad members play a crucial role in the national and global economy, transporting vital commodities and other goods to industry, businesses, and consumers.  AAR's members are common carriers and, as such, are required under federal law to provide shippers with "transportation . . . on reasonable request."  49 U.S.C. § 11101(a).

16.     Freight railroads are committed to operating in a safe and environmentally sustainable manner.  Indeed, railroads are the safest form of surface transportation, the most fuel-efficient mode of freight transportation on land, and the safest above-the-ground mode of transportation for hazardous materials.

17.     Freight railroads operate highly sophisticated and interconnected rail networks.  For example, not only do AAR's members maintain their own expansive route networks, but their networks also connect to hundreds of short-line and other railroads as well as ports, intermodal terminals, rail-truck transfer facilities, industrial sites and

warehouses, and more. These rail networks are interstate—and even international—in scope. For example, BNSF operates in 28 States and Canada, CN operates in 16 States and Canada, CPKC operates across Canada, the United States, and Mexico, and UP operates in 23 States.

18.     Freight railroads therefore depend upon a predictable and uniform national regulatory scheme for their operations. Requiring AAR's members to comply with a patchwork of state-by-state regulations in the context of their national rail networks would be costly, burdensome, impractical, and in many cases simply impossible.

19.     AAR's members operate in Minnesota as part of their interstate rail networks. BNSF operates over nearly 1,500 miles of track within Minnesota and employs roughly 1,600 people in the State. CN's subsidiary Wisconsin Central Ltd. operates over nearly 400 miles of track within Minnesota and employs roughly 500 people in the State. CPKC's subsidiary Soo Line Railroad Company operates over 1,100 miles of track within Minnesota and employs roughly 1,100 people in the State. UP operates over 400 miles of track within Minnesota and employs roughly 300 people in the State. These railroads' operations in Minnesota are an inseparable part of the larger North American transportation network, connecting to other railroads, ports, and other facilities, and moving commodities and goods across the United States and beyond.

20.     Pursuant to their common carrier obligation, freight railroads carry hazardous materials on their national route networks, including in Minnesota. Freight railroads have a long history of transporting hazardous materials safely and efficiently, in a manner that is compliant with applicable laws and regulations, environmentally

responsible, and responsive to concerns by community members and other stakeholders. Freight railroads invest heavily in their infrastructure and the development of new technologies to maintain and improve the safety of their operations, with respect to all commodities, including hazardous materials. *See* AAR, Fact Sheet: Hazmat Safety (Mar. 2024), tinyurl.com/mpzxk2zb (describing "infrastructure investment," "rigorous design standards for rail cars carrying hazmat," "specialized first responder mobile apps," and "wor[k] with the U.S. Federal Railroad Administration to create software that determines the safest, most secure rail routes for hazmat"). Freight railroads, in cooperation with shippers and other stakeholders, use industry best practices when transporting hazardous materials. Rail containers securing hazardous materials must adhere to special requirements, and less reliable methods of securement are prohibited.

21.     As a result of these investments and practices, "the hazmat accident rate is down 75% since 2000 to its lowest-ever rate." *Fact Sheet*, *supra*. Today, "[m]ore than 99.99% of all hazmat moved by rail reaches its destination without a release caused by a train accident." AAR, *Data Center* (Mar. 2024), https://www.aar.org/data-center/#!. The same safety record holds in Minnesota. According to the United States Pipeline and Hazardous Materials Safety Administration, only 23 hazardous material incidents involving rail were reported in Minnesota over the five-year period from January 1, 2019 to January 1, 2024, compared to 1,710 highway hazardous material incidents.

**B.     Minnesota Enacts The Special Assessment.**

22.     Despite the railroads' strong safety record, Minnesota enacted a law specifically targeting railroads and pipeline companies—the Special Assessment—that

requires them to pay an annual charge into a fund used in part to pay for training and equipment for responding to incidents involving hazardous materials. The Minnesota Legislature passed the Special Assessment during the 2022-2023 regular session, and Governor Tim Walz signed the Special Assessment into law on May 24, 2023, *see* H.F. No. 2887 (2023); S.F. No. 3187 (2023). The law took effect on July 1, 2023.

23.     The law amends section 299A.55 of the Minnesota Statutes to create a "railroad and pipeline safety account" in the State's special revenue fund. Minn. Stat. § 299A.55, subd. 2.

24.     The account will be funded through charges levied against "applicable rail carriers" and pipeline companies. In relevant part, Section 299A.55 as amended provides:

Subd. 4. Assessments.

(a) The commissioner of public safety must annually assess $4,000,000 to railroad and pipeline companies based on the formula specified in paragraph (b). The commissioner must deposit funds collected under this subdivision in the railroad and pipeline safety account under subdivision 2.

(b) The assessment for each railroad is 70 percent of the total annual assessment amount, divided in equal proportion between applicable rail carriers based on route miles operated in Minnesota. The assessment for each pipeline company is 30 percent of the total annual assessment amount, divided in equal proportion between companies based on the yearly aggregate gallons of oil and other hazardous substances transported by pipeline in Minnesota.

25.     The Special Assessment revives an earlier 2014 Minnesota law assessing a $2.5 million annual fee, divided 50/50 between railroads and pipeline companies. That earlier law sunsetted in fiscal year 2017.

26.     The "[a]pplicable rail carrier[s]" are defined to include any common carrier, Class I or Class II railroad or rail carrier that operates in Minnesota.  *See* Minn. Stat. § 299A.55, subd. 1(b); *id.* § 219.015, subd. 2.  That includes AAR members BNSF, CN, CPKC, and UP.

27.     In practice, the law will impose a $2.8 million annual charge—70% of $4 million—divided among five rail carriers.  *See Railroad Companies Serving Minnesota*, Minn. Dep't of Transp., https://www.dot.state.mn.us/ofrw/railroad/systems.html (listing Class I railroads that operate in Minnesota as BNSF, CN, CPKC, UP, and Class II railroads as Rapid City, Pierre & Eastern).

28.     Minnesota's Special Assessment singles out and targets railroads.  Although pipeline companies are required to pay 30% of the charge, Minnesota imposes the brunt of the charge on railroads.   And no comparable alternative charge is imposed on the transportation of hazardous materials by other modes of transportation, such as trucks, ships, and barges.  *See* 2010 Minn. Laws, ch. 215, art. 10, subd. 6 (repealing Minn. Stat. § 221.0355, which previously imposed registration requirements and fees on motor vehicle carriers and water carriers of hazardous materials).

29.     Although Minnesota appropriates some of the assessed charges for activities specifically related to railroad and pipeline safety, the railroad and pipeline safety account also serves more general purposes.  For example, the Legislature directed transfers from the account—$750,000 in fiscal year 2024 and $1,500,000 in each subsequent fiscal year— to a "grade crossing safety account."  Minn. Stat. § 299A.55, subd. 2(b)-(c).  And if the balance in the railroad pipeline and safety account exceeds $2,000,000 at the end of a fiscal

biennium, any amount above $2,000,000 must also be transferred to the grade crossing safety account. *Id.* subd. 2(f).

30.     Moreover, despite its name, the "grade crossing safety account" is not used exclusively for rail-highway crossing safety projects.  Every two years, the Minnesota Commissioner of Transportation may in his discretion "cancel" money from the grade crossing safety account and redirect it "to the trunk highway fund."  Minn Stat. § 219.1651 (2023).  The trunk highway fund is not used for any rail-related purpose at all.  *Id.* § 161.04. Rather, that fund is used principally to build and maintain "interstates and state highways." MN   House   Rsch.,   *Trunk   Highway   System*   (Jan.   2021), https://www.house.mn.gov/hrd/pubs/ss/ssthf.pdf.

31.     Whereas the Special Assessment states that this scheme's proceeds would fund training and equipment for responding to hazardous material incidents associated with rail transportation, such training and equipment can equally serve in responding to (far more frequent) incidents involving trucks.  Minnesota law requires the Commissioner of Public Safety to allocate "$100,000 annually for emergency response teams," and "the remaining amount to the Board of Firefighter Training and Education . . . , the Division of Homeland Security and Emergency Management, and the State Fire Marshal Division." Minn. Stat. § 299A.55, subd. 3(b).  The allocated funds would be used generally for "training costs" and "costs of gear and equipment related to hazardous materials readiness, response, and management"—*not* for rail-specific purposes.  *Id.* subd. 3(e).

**C.     The Special Assessment Will Injure Freight Railroads And Unreasonably Burden Rail Transportation.**

32.     AAR's members who operate in Minnesota must pay the Special Assessment in fiscal year 2024 and beyond.

33.     DPS, led by Defendant Jacobson, has primary authority to implement the Special Assessment.  Jacobson is responsible for assessing the annual charge and making specific allocations for uses of the railroad and pipeline safety account.  In February 2024, Defendant Jacobson issued assessments for fiscal year 2024 to freight railroads operating in Minnesota.

34.     Maintaining that the Special Assessment violates federal law, BNSF, CN, CPKC, and UP have refused to pay.

35.     Any assessment or tax owed to a state agency is subject to collection efforts by the Minnesota Department of Revenue.  *See* Minn. Stat. § 16D.04, subd. 2(a) ("A referring agency must refer, by electronic means, debts to the [Commissioner of Revenue] for collection."); *id.* § 16D.02, subd. 3 (defining "[d]ebt" to include an amount owed directly to a state agency "on account of a fee …, assessment, … tax, … [or] liability owed").  The Commissioner of Revenue may collect not only the assessment itself, but also any interest and collection costs.  *See id.* §§ 16D.11, .13.  And the Commissioner of Revenue and the Attorney General may also bring suit in state court to collect any amounts due.  *Id.* § 16D.14, subd. 1.

36.     AAR's members transport to, from, or in Minnesota what the State deems "hazardous substances."  *See* Minn. Stat. § 115B.02, subd. 8.  Railroads are targeted and

singled out by the Special Assessment, which does not apply to trucks, ships, or barges, and applies only at a fraction to pipeline companies.

37.     Railroads compete with other modes of freight transportation.   Many shippers are extremely price sensitive and may opt for alternative modes of transportation in response to changes in the cost of transportation by rail.  *See, e.g.*, Tom Meersman, *Rail Congestion Sends More Grain to Market on River Barges*, Minneapolis Star Trib. (Nov. 25, 2014).  To remain competitive for the business of such shippers, freight railroads would be forced in some circumstances to absorb some or all of the charge.  In other circumstances, where the railroad passes the charge along to the shippers, freight railroads will lose business to other modes of transportation or shippers will choose to ship less freight.

38.     In sum, the Special Assessment leaves freight railroads with two bad options: (a) absorb the charge themselves or (b) pass some or all of the charge along to customers, which will prompt customers either to scale back their use of transportation services or transfer their business to other modes of transportation.   Either way, the Special Assessment targets railroads and places railroads at a competitive disadvantage to other forms of transportation.

## NECESSITY FOR EQUITABLE RELIEF

39.     AAR and its members will suffer irreparable harm absent an injunction. Requiring AAR's members to pay the Special Assessment and potentially raise prices for their customers will damage their relationship with customers and make their services less economically competitive.  In addition to lost revenue and profits, AAR's members will experience damage to goodwill that will be difficult to restore.  *See Iowa Utils. Bd. v. FCC*,

109 F.3d 418, 426 (8th Cir. 1996) ("[P]otential loss of consumer goodwill qualifies as irreparable harm.").

40.     Injunctive relief is appropriate because AAR's members have no adequate remedy at law for these harms.  Even if the charge is later determined to be unlawful, AAR will not be able to recover compensatory damages from the State of Minnesota due to the State's sovereign immunity.

41.     Enjoining the Special Assessment would also serve the public interest, by preventing distortions to the free play of market forces envisioned by federal law, protecting the national system of rail transportation, and affording relief from the uncertainty and disruption caused by the law.

## CLAIMS FOR RELIEF

### Count One
### Preemption Under The ICC Termination Act

42.     AAR incorporates all preceding paragraphs by reference.

43.     The Special Assessment is preempted under ICCTA, 49 U.S.C. § 10501(b), and the Supremacy Clause of the United States Constitution.  When a state or local law conflicts with or stands as an obstacle to the objectives of a federal law or intrudes on a field that Congress reserved for the federal government, the Supremacy Clause of the Constitution of the United States preempts that state or local law.

44.     ICCTA preempts the Special Assessment because the Special Assessment discriminates against railroads by targeting them for the assessment, while leaving

competing modes of transportation unaffected, and imposes a significant, undue, and unreasonable burden on railroad transportation.

45.     ICCTA vests "exclusive" jurisdiction in the Surface Transportation Board ("STB") "over . . . transportation by rail carriers . . . with respect to rates, classifications, rules . . . , practices, routes, services, and facilities of such carriers." 49 U.S.C. § 10501(b). States may not legislate in the areas committed to the STB's authority. *Id.* (ICCTA "preempt[s] the remedies provided under . . . State law"). It is "difficult to imagine a broader statement of Congress' intent to preempt state regulatory authority over railroad operations." *Soo Line R.R. Co. v. City of St. Paul*, 827 F. Supp. 2d 1017, 1021 (D. Minn. 2010). Through ICCTA's "broad and sweeping" preemptive force, *Union Pac. R.R. Co. v. Chi. Transit Auth.*, 647 F.3d 675, 678 & n.1 (7th Cir. 2011), "Congress recognized that continuing state regulation . . . would 'risk the balkanization and subversion of the Federal scheme of minimal regulation for this intrinsically interstate form of transportation,'" *Iowa, Chi. & E. R.R. Corp. v. Wash. Cnty.*, 384 F.3d 557, 559 (8th Cir. 2004).

46.     State laws that "discriminate" against railroads are preempted by ICCTA. *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 253 (3d Cir. 2007). ICCTA "preempts all state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation." *Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 102 (2d Cir. 2009) (quotation marks omitted); *see also Delaware v. STB*, 859 F.3d 16, 18 (D.C. Cir. 2017) (same). "[F]or a state regulation to pass muster, it must

address state concerns generally, without targeting the railroad industry." *Susquehanna*, 500 F.3d at 254.

47.    State laws are also preempted by ICCTA if they have "the effect of preventing or unreasonably interfering with railroad transportation." *City of Ozark v. Union Pac. R.R. Co.*, 843 F.3d 1167, 1171 (8th Cir. 2016); *see Delaware*, 859 F.3d at 20 (state laws may not "unreasonably burden rail transportation").

48.    The Special Assessment targets and discriminates against railroads.  On its face, the law directs specified railroads to pay 70% of a $4 million assessment each and every year.  Pipeline companies are responsible only for the remaining 30%, while motor carriers and water carriers pay nothing—even though the account created by the law would fund highways and training and response for hazardous material incidents resulting from those alternative modes of transportation.  The Special Assessment is not a "generally applicable" law with merely incidental effects on railroads, *Delaware*, 859 F.3d at 18; it directly "targets the railroad industry," *Susquehanna*, 500 F.3d at 254.  The Special Assessment imposes a charge on companies simply because they are rail carriers—the charge is not in any way related to the particular risks railroads may present by carrying hazardous substances.  Whereas pipelines pay according to the "yearly aggregate gallons of oil and other hazardous substances transported by pipeline in Minnesota," railroads are assessed the fee *regardless* of whether or not they carry hazardous substances based "on route miles operated in Minnesota."  Minn. Stat. § 299A.55, subd. 4.  A railroad that carries small amounts of hazardous substances—or even no hazardous substances at all—must still pay the full charge, simply by virtue of being a railroad.

49.     The Special Assessment also "unreasonably interfer[es] with railroad transportation." *City of Ozark*, 843 F.3d at 1171; *see Wedemeyer v. CSX Transp., Inc.*, 850 F.3d 889, 894 (7th Cir. 2017).  Freight railroads must either absorb the significant costs of the Special Assessment or else pass them on to customers, threatening lost profits and goodwill.  *See BNSF Ry. Co. v. Town of Cicero*, 592 F. Supp. 3d 716, 729 (N.D. Ill. 2022) (holding that railroad had stated a claim for ICCTA preemption because increase in monthly sewer rates from "$27.42 per month to $350 per month" "interferes with rail service").  The effect of the Special Assessment is to render rail a less attractive mode of transportation than competing modes, unreasonably burdening "transportation by rail carriers," 49 U.S.C. § 10501(b).

### Count Two
### <u>Preemption Under The Hazardous Materials Transportation Act</u>

50.     AAR incorporates all preceding paragraphs by reference.

51.     The Special Assessment is preempted by the HMTA, 49 U.S.C. § 5125, because it regulates the transportation of hazardous waste by rail and imposes an unfair fee on the transportation of hazardous materials by rail.

52.     Under the HMTA, the Secretary of Transportation "shall prescribe regulations for the safe transportation, including security, of hazardous material in intrastate, interstate, and foreign commerce," including by rail.  49 U.S.C. § 5103(b)(1). "[T]here is strong support for the notion that a primary Congressional purpose intended to be achieved through the legislation was to secure a general pattern of uniform national regulations."  *Nat'l Tank Truck Carriers, Inc. v. Burke*, 608 F.2d 819, 824 (1st Cir. 1979).

And "Congress expressly contemplated that the Secretary [of Transportation] would employ his powers to achieve safety by enhancing uniformity in the regulation of hazardous materials transportation." *Colo. Pub. Utils. Comm'n v. Harmon*, 951 F.2d 1571, 1581 (10th Cir. 1991).

53.     To the extent the HMTA leaves any room for States to impose "fees" on the transportation of hazardous materials, it at most authorizes fees that are "fair."  49 U.S.C. § 5125(f)(1) ("A State . . . may impose a fee related to transporting hazardous material only if the fee is fair and used for a purpose related to transporting hazardous material, including enforcement and planning, developing, and maintaining a capability for emergency response").

54.     The Special Assessment is preempted by the HMTA because it is not "fair." A charge for transporting hazardous materials is "unfair [when] it imposes a burden on railroads that it does not impose on the trucking industry."  *BNSF Ry. Co. v. Cal. Dep't of Tax & Fee Admin.*, 904 F.3d 755, 766 (9th Cir. 2018).  The Special Assessment singles out railroads to bear the brunt of fees used to respond to hazardous material incidents.  "The risks, and associated costs, of hazardous materials spills are substantial for both rail and trucking."  *Id*.  Minnesota could have but chose not to impose equivalent fees on trucking companies, "thus favoring the trucking industry at the expense of railroads."  *Id.* at 766-67.

55.     Moreover, the Special Assessment is not "fair" because it applies to railroads based solely "on route miles operated in Minnesota" regardless of whether the railroad carries hazardous substances or, if it does carry hazardous substances, the amount.  Minn. Stat. § 299A.55, subd. 4.  The Special Assessment thus unfairly imposes a burden on

17

railroads to pay for risks to which they may not even contribute. Indeed, it is the height of unfairness to require a railroad that transports a small amount of hazardous substances— or none at all—to pay the Special Assessment, while excusing a trucking company that transports large volumes of hazardous substances.

56.     The Special Assessment is therefore preempted by the HMTA.

**Count Three**
**Preemption Under The 4-R Act**

57.     AAR incorporates all preceding paragraphs by reference.

58.     The Railroad Revitalization and Regulatory Reform Act of 1976, Pub. L. No. 94-210, 90 Stat. 31, was enacted to advance the financial stability of the United States railway system. "[R]ailroads are easy prey for State and local tax assessors in that they are nonvoting, often nonresident, targets for local taxation, who cannot easily remove themselves from the locality." *Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 336 (1994) (quotation marks omitted). To remove the "temptation to excessively tax" railroads "to subsidize general welfare spending," the 4-R Act prohibits state and local tax schemes that discriminate against railroads. *W. Air Lines, Inc. v. Bd. of Equalization of S.D.*, 480 U.S. 123, 131 (1987); *see Union Pac. R.R. Co. v. Minn. Dep't of Revenue*, 507 F.3d 693, 695 (8th Cir. 2007) (similar).

59.     Given the diversity of state and local tax schemes, "the nomenclature provided to the [state] charge at issue is not material" to the question whether the charge is a tax in substance under federal law. *Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134 (4th Cir. 2000); *see Bidart Bros. v. Cal. Apple Comm'n*, 73 F.3d 925, 931 (9th Cir.

1996).  Instead, courts consider whether the charge "raises revenue to spend for the general public welfare" (making it a tax), *Chi. & N. W. Transp. Co. v. Webster Cnty. Bd. of Supervisors*, 71 F.3d 265, 267 (8th Cir. 1995), or instead is "tied to a particular benefit obtained by a specific taxpayer" (making it a fee), *Kansas City S. Ry. Co. v. Koeller*, 653 F.3d 496, 507 (7th Cir. 2011).  The meaning of "tax" is "expansive," and can cover fees as diverse as an "annual maintenance assessment" for a district's flood control purposes, *id.* at 505-07, or a sewage rate charge for operating and maintaining a town's sewer system, *BNSF*, 592 F. Supp. 3d at 731.

60.     Under the 4-R Act, a State "may not" impose discriminatory property taxes or "[i]mpose another tax that discriminates against a rail carrier."  49 U.S.C. § 11501(b).  A tax is discriminatory when it offers more favorable treatment to motor carriers or other modes of transportation that compete with railroads.  *See Ala. Dep't of Revenue v. CSX Transp., Inc.*, 575 U.S. 21, 26 (2015) (tax is discriminatory "when it treats 'groups [that] are similarly situated' differently without sufficient 'justification for the difference in treatment'"); *Union Pac.*, 507 F.3d at 695 (competitive class to railroads for 4-R Act purposes includes "motor carriers" and "air carriers").  "[A] showing that the railroads have been targeted [for taxation] is enough to prove discrimination" under the 4-R Act.  *Koeller*, 653 F.3d at 510.

61.     For purposes of this count only, and without prejudice to AAR's alternative claims, the Special Assessment is in substance "another tax" within the meaning of 49 U.S.C. § 11501(b)(4).

62.     The Special Assessment impermissibly discriminates against railroads by singling them out vis-à-vis motor carriers, water carriers, and pipelines for differential treatment.  Truck, ship, and barge companies pay nothing, and pipelines pay only a fraction of the assessment.  Even if pipelines paid the same fraction, it is enough that "two other members of the competitive class—motor carriers and [water] carriers—are not" paying anything.  *Union Pac.*, 507 F.3d at 696.  There is no adequate justification for the discriminatory treatment of railroads under the Special Assessment.

63.     The Special Assessment thus violates the 4-R Act.

## Count Four
## Declaratory Relief Under 28 U.S.C. § 2201

64.     AAR incorporates all preceding paragraphs by reference.

65.     This action presents an actual case or controversy between AAR and Defendants concerning the validity and enforceability of the Special Assessment.

66.     Because the Special Assessment violates ICCTA, HMTA, or alternatively the 4-R Act, AAR seeks and is entitled to a declaration under 28 U.S.C. § 2201 that the Special Assessment is invalid and unenforceable for the reasons stated above.

## Count Five
## Injunctive Relief Under The Court's Equitable Powers

67.     AAR incorporates all preceding paragraphs by reference.

68.     Under the Court's equitable powers, AAR is entitled to injunctive relief against Defendants, whose enforcement of the Special Assessment against AAR's members would conflict with and violate ICCTA, HMTA, or alternatively, the 4-R Act.

69.     AAR is likely to succeed on the merits of its claims.

70.    AAR's members would suffer irreparable harm for which they have no adequate remedy at law if the Special Assessment were not enjoined.

71.    The balance of harms and the public interest weigh heavily in favor of injunctive relief.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff AAR respectfully requests that the Court:

A.  Declare that the Special Assessment violates ICCTA, HMTA, or alternatively, the 4-R Act;

B.  Enjoin Defendants, as well as their officers, agents, servants, employees, and attorneys, and those persons acting in concert or participation with them, from taking any action to enforce the Special Assessment against AAR or its members; and

C.  Grant AAR any other relief this Court deems just and proper.


Dated:  April 26, 2024

*/s/ Andrew Davis*
Andrew Davis (#0386634)
Jackson Kennedy (#0504319)
STINSON LLP
50 South Sixth Street Suite 2600
Minneapolis, Minnesota 55402
Telephone: 612.335.1500
andrew.davis@stinson.com
jackson.kennedy@stinson.com

Thomas H. Dupree Jr.
(*pro hac vice forthcoming*)
Jeffrey Liu
(*pro hac vice forthcoming*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Telephone:  202.955.8500
Facsimile:  202.467.0539
TDupree@gibsondunn.com
JYLiu@gibsondunn.com

**Attorneys for Plaintiff**
**Association of American Railroads**