### UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

| | |
|---|---|
| Association of American Railroads, | No. 24-cv-1522 (KMM/TNL) |
| Plaintiff/Counter Defendant, | |
| v. | |
| | **ORDER** |
| Bob Jacobson, *Commissioner of the Minnesota Department of Public Safety*; Paul Marquart, *Commissioner of the Minnesota Department of Revenue*; | |
| Defendants/Counter Claimants. | |

The Association of American Railroads (hereafter "AAR" or "the Association") filed this action in April 2024 seeking a declaration that a Minnesota statute imposing a revenue assessment upon rail carriers is preempted by federal law and an injunction prohibiting the Commissioners of the Minnesota Departments of Public Safety and Revenue, Bob Jacobson and Paul Marquart, respectively, from enforcing the assessment against AAR's members. The Commissioners answered the complaint, denying that AAR was entitled to relief, and asserted counterclaims against AAR seeking a declaration that the Minnesota assessment was not preempted by federal law. Defendants also filed a Third-Party Complaint against certain of AAR's members seeking similar declaratory relief and a money judgment requiring the Third-Party Defendants to pay invoices pursuant to the assessment. AAR and the Third-Party Defendants filed a motion to dismiss Commissioner Jacobson's Counterclaim and Third-Party Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). Pl.'s Mot. to Dismiss (Doc. 46). The

Court held a hearing on the motion on October 2, 2024. For the reasons that follow, AAR's motion is denied.

## BACKGROUND

In response to several widely publicized derailments of trains carrying hazardous materials in 2023, the Minnesota Legislature passed a bill amending Minn. Stat. § 299A.55, which concerns safe handling of hazardous substances by railroads and pipelines. The law revived an annual assessment applicable to railroad and pipeline companies that had expired on July 1, 2017 under a prior version. In relevant part, the law requires the Commissioner of the Minnesota Department Public Safety, Bob Jacobson, to assess $4,000,000 to the railroad and pipeline companies according to an established formula, with 70 percent of the assessment being levied on the railroads, and 30 percent to the pipelines.

> **Subd. 4. Assessments.** (a) The commissioner of public safety must annually assess $4,000,000 to railroad and pipeline companies based on the formula specified in paragraph (b). The commissioner must deposit funds collected under this subdivision in the railroad and pipeline safety account under subdivision 2.
>
> (b) The assessment for each railroad is 70 percent of the total annual assessment amount, divided in equal proportion between applicable rail carriers based on route miles operated in Minnesota. The assessment for each pipeline company is 30 percent of the total annual assessment amount, divided in equal proportion between companies based on the yearly aggregate gallons of oil and other hazardous substances transported by pipeline in Minnesota.

Minn. Stat. § 299A.55 (hereafter "the assessment" or "the Minnesota assessment").

Several railroad companies subject to the assessment are members of the Association. AAR is a nonprofit trade association whose members include North American freight railroads and passenger and commuter railroads. Among the Association's members are BNSF Railway Company ("BNSF"), Canadian National Railway ("CN"), Canadian Pacific Kansas City ("CPKC") and Union Pacific ("UP"), all of which operate in Minnesota and elsewhere.

In February 2024, pursuant to the assessment, the State Fire Marshal for the Minnesota Department of Public Safety sent invoices for the 2024 fiscal year to freight railroads operating in Minnesota. Based on the number of route miles each rail carrier operates in Minnesota: BNSF was assessed $1,205,780.35; CN was assessed $305,086.71; CPKC's subsidiary, Soo Line Railroad Company ("Soo Line"), was assessed $916,069.36; and UP was assessed $338,265.90. BNSF, CN, CPKC, and UP refused to pay the assessments, informing the State of their view that the Minnesota law is preempted by federal law.

Consistent with the position taken by the railroads that refused to pay the assessment, the Association filed this lawsuit on April 26, 2024, against Commissioner Jacobson and Commissioner Marquart. As noted, the Association seeks a declaratory judgment that the Minnesota law is preempted by several federal statutes, as well as an injunction prohibiting the Defendants from taking any action to enforce the assessment against its members. Specifically, AAR claims that three federal statutes preempt the Minnesota assessment—the ICC Termination Act ("ICCTA"), 49 U.S.C. § 10501(b); the

Hazardous Materials Transportation Act ("HMTA"), 49 U.S.C. § 5125; and the Railroad Revitalization and Regulatory Reform Act of 1976 ("4-R Act"), 49 U.S.C. § 11501(b).

On June 7, 2024, Commissioner Jacobson and Commissioner Marquart filed their Answer to Complaint and Counterclaim. A few weeks later, Commissioner Jacobson also filed a Third-Party Complaint against several of AAR's members, including BNSF; CN's subsidiaries Wisconsin Central Ltd. and Cedar River Railroad Company; CPKC's subsidiary, Soo Line; and UP. The Counterclaim and the Third-Party Complaint largely overlap in their factual allegations. In both, Commissioner Jacobson asserts that railroad companies subject to the assessment have failed to prioritize safety of their hazardous-materials-carrying trains, leading to catastrophic consequences when these trains have accidents. According to Commissioner Jacobson, the railroads have cut corners on safety measures in an effort to maximize their already significant profits. Commissioner Jacobson asserts that the assessment is an appropriate and fair means of ensuring that the state has the funds needed to train first responders and otherwise be prepared to address future railway accidents. Commissioner Jacobson seeks a judgment declaring that the Minnesota assessment is not preempted by ICCTA, HMTA, or the 4-R Act and a money judgment against the individual railroads named as Third-Party Defendants.

The Association moved to dismiss the Counterclaim and the Third-Party Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). It asks the Court to dismiss all claims and counterclaims asserted against AAR and the Third-Party Defendants with prejudice. Proposed Order at 2 (Doc. 50). It simultaneously asks the

Court to "hold that the [assessment] is preempted by ICCTA, the HMTA, and/or the 4-R Act." Pl.'s Mem. at 2 (Doc 48).

## DISCUSSION

### I.   Rule 12(b)(6) Standard

When reviewing a motion to dismiss a counterclaim or third-party complaint pursuant to Rule 12(b)(6), courts apply the "familiar standards governing a Rule 12(b)(6) motion," and they consider the factual allegations in those pleadings and materials embraced by those pleadings, not the allegations found in the plaintiff's operative complaint. *Holmgren v. Woodside Credit, LLC*, 672 F. Supp. 3d 680, n.2 (D. Minn. 2023) (citing *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014)). The pleading must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The pleading cannot merely restate the "elements of a cause of action" alongside "mere conclusory statements." *Ashcroft v. Iqbal*, 565 U.S. 662, 678 (2009).

When reviewing the pleading to determine whether it states a plausible claim, the Court views the allegations "in the light most favorable to the counterclaimant" or third-party plaintiff. *Fairview Health Servs. v. Quest Software, Inc.*, No. 20-cv-01326 (SRN/LIB), 2021 WL 679260, at *4 (D. Minn. Feb. 22, 2021). However, a court is not required to accept the counterclaimant's "wholly conclusory allegations" as true, "or legal conclusions that the pleader draws from the facts pled." *State Farm Mut. Auto. Ins. Co. v. Merrill*, 253 F. Supp. 3d3 835, 841 (D. Minn. 2018). Courts do not consider matter outside the pleadings on a motion to dismiss. Fed. R. Civ. P. 12(d). Nevertheless, courts

"may look to the pleadings, documents attached to the pleadings, materials embraced by the pleadings[,] and matters of public record." *Hageman v. Barton*, 817 F.3d 611, 620 n.8 (8th Cir. 2016) (cleaned up).

Generally, a party defending against a claim raises ordinary preemption defenses such as express and implied preemption in a motion under Rule 12(c) for judgment on the pleadings after filing an answer. This is because they are affirmative defenses that a defending party has the obligation to plead and prove. *Wuebker v. Wilbur-Ellis Co.*, 418 F.3d 883, 886 (8th Cir. 2005) (citing *Chapman v. Lab One*, 390 F.3d 620, 624–25 (8th Cir. 2004)); *Fisher v. Halliburton*, 667 F.3d 602, 609 (5th Cir. 2012). Raising preemption in a Rule 12(b)(6) motion is only proper where the applicability of the defense is established on the face of the opponent's pleading. *Fisher*, 667 F.3d at 609. "The party asserting preemption bears the burden of establishing it." *Stephens v. Target Corp.*, 694 F. Supp. 3d 1136, 1141 (D. Minn. 2023) (citing *Pharm. Care Mgmt. Assoc. v. Wehbi*, 18 F.4th 956, 972 (8th Cir. 2021)).

## II.    The Proper Record

As an initial matter, the Association's motion to dismiss finds itself on somewhat shaky procedural footing. The Association asserts that in addition to relying on facts alleged in its own Complaint that the Defendants have expressly admitted, it is relying on facts that Commissioner Jacobson "does not deny." Pl.'s Mem. 3 n.1. However, in its recitation of the relevant factual background, AAR includes assertions from its own Complaint that Defendants have, in fact, denied. Some they did so expressly, and as to other allegations they assert that they lack knowledge sufficient to form a belief

6

concerning those allegations' truth. For the express denials, the problem is obviously that Defendants' responses flatly contradict what the Association uses as the factual background on which it claims to be entitled to dismissal. The problem with relying on allegations where Defendants have stated they lack sufficient information to form a belief to an allegation is no different—when a party responds that way to an opponent's allegations, the Federal Rules of Civil Procedure plainly state that the response constitutes a denial. Fed. R. Civ. P. 8(b)(5). The Rule couldn't be clearer.

In one example of this problem, the Association's brief in support of its motion asserts that "[o]ver the last two decades, railroads have invested significantly in infrastructure and adopted best practices to improve the safety of [their] operations." Pl.'s Mem. 4. AAR made precisely that allegation in Paragraph 20 of its Complaint, Compl. ¶ 20, but Defendants "deny that freight railroads invest heavily in their infrastructure and the development of new technologies to maintain and improve the safety of their operations," Ans. ¶ 20. The Association's brief, therefore, incorrectly suggests that the facts it sets forth includes only the matters that Defendants "do not deny."

Perhaps AAR believes that these matters are, nevertheless, appropriate for consideration on its motion to dismiss because they are based on "matters of public record" that the Court can take into account under Rule 12(b)(6). *See* Pl.'s Mem. 3 n.1 (referring to matters of public record). Indeed, AAR's Complaint and its brief hint at that implication. They both point to a "Fact Sheet" and a "Data Center" report, which are prepared either by or for AAR and are available on AAR's own website. Compl. ¶¶ 20–21; Pl.'s Mem. 4. Defendants have not admitted the contents of these website materials

that tout the Association's members' impressive safety record, and the context in which they appear leaves more than a little doubt about whether they could ever be considered matters of public record for purposes of a Rule 12(b)(6) analysis.

In another passage, AAR suggests that Defendants' Answer does not deny a finding from the United States Pipeline and Hazardous Material Safety Administration ("PHMSA") that over the last five years in Minnesota, trucks were involved in nearly 75 times as many hazardous materials incidents as railroads. Pl.'s Mem. 9. This assertion is drawn directly from Paragraph 21 of AAR's Complaint. But contrary to AAR's assertion that Defendants do not deny this allegation, they respond to everything in Paragraph 21 by stating that they "they lack knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph." Ans. ¶ 21. To treat the Association's allegation as true for purposes of the Association's motion to dismiss Defendants' claims would flip Rule 12(b)(6) on its head.

Parties often attempt to bring matters into a court's field of vision under Rule 12(b)(6) that don't belong there, a reality that can largely be explained by zealous advocacy. AAR similarly attempts to sharpen the picture before the Court to fit its own aims, and the Court intends to cast no aspersions on the party or its counsel by making these observations. But here the Court is faced with AAR's request for it to rely on a factual landscape that includes assertions of fact that Defendants have definitively denied for purposes of a 12(b)(6) analysis. As a result, the Court declines AAR's invitation to consider AAR's own allegations as true for purposes of its motion to dismiss the Defendants' Counterclaim and Third-Party Complaint. The Court has, instead, focused

on the allegations in Defendants' pleadings to determine whether AAR is correct that they should be dismissed for failure to state a claim.

## III.    Preemption Analysis

Having clarified the appropriate lens through which to view the Association's motion to dismiss, the Court turns to the Association's assertion the Commissioners' counterclaims and third-party claims must be dismissed on preemption grounds. The party asserting preemption has the burden of establishing that it applies. *Williams v. Nat'l Football League*, 582 F.3d 863, 880 (8th Cir. 2009); *Lowry v. City of Minneapolis*, No. 20-cv-2189 (PJS/TNL), 2022 WL 2763757, at *4 (D. Minn. July 15, 2022). Preemption stems from the Supremacy Clause, which declares federal law "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Federal law can preempt state law in one of three ways: (1) by express statutory language, (2) by occupying the entire legislative or regulatory field, or (3) by conflicting with the state law. *See WinRed, Inc. v. Ellison*, 59 F.4th 934, 941 (8th Cir. 2023). These labels and categories, however, "are not rigidly distinct." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 US. 363, 372 n.6 (2000)).

### A.  The 4-R Act

The Association argues that the Court should dismiss Defendants' claim for a declaratory judgment that the Minnesota assessment is not preempted by the 4-R Act. The Railroad Revitalization and Regulatory Reform Act prohibits tax discrimination against rail transportation property. 49 U.S.C. § 11501. In relevant part, § 11501 provides as follows:

9

CASE 0:24-cv-01522-KMM-TNL    Doc. 70    Filed 12/11/24    Page 10 of 31

> (b) The following acts unreasonably burden and discriminate against interstate commerce, and a State . . . may not do any of them:
>
> . . . .
>
>> (4) Impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Board under this part.

*Id.* § 11501(b)(4).[1] The Court refers to paragraph (b)(4) as "the catch-all provision" in this Order.

### 1. Defining a "Tax"

"The 4-R Act does not define 'tax'; nor does the statute otherwise place any matters within, or exclude any matters from, the term's ambit." *CSX Transp., Inc. v. Ala. Dep't of Rev.*, 562 U.S. 277, 284 (2011).

> The meaning of "tax" is expansive. A State (or other governmental entity) seeking to raise revenue may choose among multiple forms of taxation on property, income, transactions, or activities. "Another tax," as used in subsection (b)(4), is best understood to refer to all of these—more precisely, to encompass any form of tax a State might impose, on any asset or transaction, except the taxes on property previously addressed in subsections (b)(1)–(3).

*Id.* at 284–85 (cleaned up); *see also Chicago & N.W. Transp. Co. v. Webster Cnty. Bd. of Supervisors*, 71 F.3d 265, 266 (8th Cir. 1995) (hereafter "*Webster County*") (describing § 11501(b)(4) as a "catch-all that forbids all taxes that discriminate against railroads") (internal quotations omitted).

---

[1] The Association does not argue that the Minnesota assessment is preempted by the language of 49 U.S.C. § 11501(b)(1) through (3).

The Eighth Circuit has provided a formulation of what constitutes a "tax" for purposes of the 4-R Act: "a government levy is a tax if it raises revenue to spend for the general public welfare." *Webster Cnty.*, 71 F.3d at 267. In reaching that conclusion, the *Webster County* court cited several cases from other circuit courts considering when a levy is a tax. *Id.* In doing so, it noted the emphasis on the "revenue's ultimate use, asking whether it provides a general benefit to the public." *Id.* (quoting *San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n*, 967 F.2d 683, 685 (1st Cir. 1992). It also pointed to a D.C. Circuit Court of Appeals decision indicating that a levy is a tax "when its principal purpose is to raise revenues," *id.* (citing *Brock v. Wash. Metro. Area Transit Auth.*, 796 F.2d 481, 489 (D.C. Cir. 1986), and a Third Circuit Court of Appeals case concluding that a law involves a tax when "moneys collected are added to the public fisc," *id.* (citing *Robinson Protective Alarm Co. v. City of Philadelphia*, 581 F.2d 371, 376 (3d Cir. 1978).

## 2.  Discrimination Against a Rail Carrier

Even when the state law imposes a "tax," to be preempted by the 4-R Act's catch-all provision, it must still "discriminate[] against a rail carrier." The 4-R Act does not define what it means for a tax to "discriminate" against a railroad. *CSX Transp., Inc.*, 562 U.S. at 286. However, the Supreme Court explained that discrimination involves a "failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored." *Id.* (quoting Black's Law Dictionary 534 (9th ed. 2009)). "To charge one group of taxpayers a 2% rate and another group a 4% rate, if the groups are the same in all relevant respects, is to discriminate against the latter." *Id.* at 287.

The Eighth Circuit has held that "[i]n determining whether a tax impermissibly discriminates against a rail carrier in violation of § 11501(b)(4), a court must first determine the class of taxpayers with whom the railroads are to be compared." *Union Pac. R.R. Co. v. Minn. Dep't of Rev.*, 507 F.3d 693, 695 (8th Cir. 2007). In this context, courts look at "the 'competitive mode' comparison class, which is comprised of the railroads' direct competitors." *Id.* (citing *Burlington N., Santa Fe Ry. Co. v. Lohman*, 193 F.3d 984, 985 (8th Cir. 1999)). A relevant comparison class depends upon the "type of tax and discrimination challenged in a particular case," but courts need not compare the challenged law to "a state's overall tax structure" to determine its fairness. *Lohman*, 193 F.3d at 986.

### 3.  Application

The Association argues that the Court can determine from the pleadings alone that the Minnesota assessment is a discriminatory tax preempted by the 4-R Act's catch-all provision. According to AAR, the assessment is a tax because the statute raises money for the general public welfare and "bears no relationship to any benefits railroads may receive." Pl.'s Mem. 21. Further, AAR contends that the assessment is discriminatory because it imposes the tax on railroads, but not on other freight carriers such as trucks, barges, ships, and airplanes, which are part of the relevant comparison class. *Id.* at 18–19.

Even assuming, for purposes of this decision, that the Minnesota assessment falls within the category of a "tax" to which the 4-R Act's catch-all provision applies, the Court concludes that it cannot resolve the issue of whether it is discriminatory based on

12

the record at this stage.[2] True, the statute does not impose the same obligations on trucks, barges, ships, and airplanes that it imposes on rail carriers. But whether that means the law "discriminates against a rail carrier" under the catch-all provision is not so simply resolved, as a matter of law, as AAR suggests. The Supreme Court's decision in *CSX Transportation, Inc.* makes it very clear that the issue of "discrimination" in a case like this may be difficult to resolve; indeed, the Court explained that "[d]iscrimination cases sometimes do raise knotty questions about whether and when dissimilar treatment is adequately justified." 562 U.S. at 297. *CSX Transportation, Inc.* explains that discrimination focuses on whether one group is treated less favorably than another despite the absence of any "reasonable distinction" between the two. *Id.* at 286. And it defines discrimination by reference to whether "the groups are the same in all relevant respects." *Id.* at 287.

These observations about what it means for a tax to discriminate would make no sense if the matter were as simple as looking at a state law and determining if every possible carrier that could be compared to a railroad was treated identically. And there is nothing on the face of the Counterclaim and the Third-Party Complaint that would allow the Court to conclude, as a matter of law, that no reasonable distinction could possibly be

---

[2] The Court expresses no opinion in this Order on whether the Minnesota assessment is a "tax" for purposes of the catch-all provision and notes that the issue is contested by the parties. In addition, the Court is not persuaded by AAR's assertion that the Commissioners waived or conceded that the Minnesota assessment "discriminates against rail carriers" for purposes to the 4-R Act. Hr'g Tr. (Oct. 2, 2024) 39:11–20 (Doc. 69); Pl.'s Reply 15 (Doc. 66). The Commissioners' briefing preserved arguments about the need for discovery and a more developed factual record in the context of fairness questions raised under the HMTA, which overlap with the discrimination issue under the 4-R Act.

drawn between rail carriers and the other freight industries identified by the Association. The record properly before the Court at this stage simply does not show that railroads, on the one hand, and trucks, barges, ships, and airplanes, on the other, are the *same in all relevant respects*. A more developed factual record will be necessary for the Court to resolve the preemption question raised not only by the Commissioners' Counterclaim and Third-Party Complaint, but also presented in AAR's pleadings.

The Association's arguments to the contrary are unpersuasive. For one thing, the Association cites no cases where district courts have resolved the issue of discrimination under the catch-all provision on a Rule 12(b)(6) motion. Citing *Lohman*, 193 F.3d at 985–86, the Association asserts that the "comparison class for railroads includes other carriers of freight, such as trucks, barges, ships, and airplanes." Pl.'s Mem. 18.[3] But *Lohman* says that the "comparison class should be appropriate to the type of tax and discrimination challenged in a particular case," 193 F.3d at 986, and does not hold, as a matter of law, that regardless of such context, the "competitive mode class" for railroads necessarily consists of AAR's list of other carriers. In fact, in *Lohman* the there was no dispute about what the proper comparison class was for the sales and use taxes at issue. *Id.* ("Both sides agree that the railroads's competitors are barges and trucks."); *see also Minn. Dep't of Revenue*, 507 F.3d at 695 ("The Railroads and the State agree that for

---

[3] At the hearing on the motion, the Association's counsel suggested that the Court could "simply take judicial notice that [ships, barges, and trains] are all competing modes of freight transportation." Hr'g Tr. (Oct. 2, 2024) 10:11–17 (Doc. 69). Even if the Association is correct that the Court *could* properly take judicial notice that at least some of the other carriers it has identified also haul hazardous materials, that does not persuade the Court that doing so would necessarily resolve the legal question of which other carriers constitute the competitive mode class in the context of the Minnesota assessment.

purposes of this appeal the competitive mode class is the proper comparison class and that it consists of motor carriers, air carriers, barges, and Great Lakes ships.").[4] That is not the situation before the Court in this case. The Court finds that it cannot determine the proper class of competitors based on the record at this stage.

The other cases cited by AAR in its briefing on this issue similarly do not convince the Court that a 4-R Act discrimination analysis is as simple as AAR insists. AAR does not cite a single case in which a court has resolved this issue on a Rule 12(b)(6) motion. For example, AAR points to *Ogilvie v. State Board of Equalization of the State of North Dakota*, where the court stated that the "most obvious form of tax discrimination is to impose a tax on a class of rail transportation property that is not imposed on other nonrailroad property of the same class." 657 F.2d 204, 210 (8th Cir. 1981). But applying that broad principle to the Minnesota assessment and concluding that it is an obviously discriminatory tax because it doesn't apply to trucks and barges would simply beg the question of whether they are properly deemed to be in "the same class." And although the court in *Trailer Train Co. v. State Tax Commission* states that "a tax that applies only to one class of businesses necessarily discriminates against that class," 929 F.2d 1300, 1303 (8th Cir. 1991), this Court could not determine that the Minnesota assessment necessarily discriminates against railroads based on that pronouncement alone without ignoring the more recent decisions in *Lohman* and *CSX Transportation, Inc.*

---

[4] *Lohman* involved a Missouri sales and use tax imposed on the fuel used by railroad companies, but the law exempted the railroads' major competitors. 193 F.3d at 984–85. In *Minnesota Department of Revenue*, railroad companies challenged a Minnesota assessment of sales or use tax on fuel used by railroads but exempted some of the railroads' competitors from paying the tax. 507 F.3d at 694.

For these reasons, the motion to dismiss the Counterclaims and Third-Party Complaint on 4-R Act preemption grounds is denied. In reaching this conclusion, of course, the Court expresses no opinion on the ultimate merits of either AAR's or the Commissioners' position. The Court simply finds that AAR has not demonstrated that the discrimination question before the Court is amenable to resolution on the motion to dismiss and the record properly before the Court.

### B. HMTA

AAR also seeks to dismiss Defendants' Counterclaims and the Third-Party Complaint because the Minnesota assessment is preempted by the Hazardous Materials Transportation Act. "The HMTA authorizes the Secretary of Transportation to 'prescribe regulations for the safe transportation, including security, of hazardous materials in intrastate, interstate and foreign commerce.'" *Trimbur v. Norfolk S. Ry. Co.*, No. 2:13-CV-0160, 2015 WL 4755205, at *5 (S.D. Ohio Aug. 10, 2015) (quoting 49 U.S.C. § 5103(b)(1)). "One of the purposes of the amendment was 'to broaden federal regulatory control over interstate and foreign shipments of hazardous materials by rail and other transportation modes.'" *Consol. Rail Corp. v. City of Bayonne*, 724 F. Supp. 320, 326 (D.N.J. 1989) (quoting H.R. Rep. No. 1083, 93d Cong., 2d Sess. 4, *reprinted in* 1974 Code Cong. & Admin. News 7669).

The HMTA contains an express preemption provision under which a state or a person affected by a state requirement may "seek[] a decision on preemption from a court of competent jurisdiction." 49 U.S.C. § 5125(a), (d)(3). The HMTA provides, generally, that a state requirement is preempted if (1) complying with both the state law and the

HMTA is impossible, or (2) if the state requirement presents an obstacle to accomplishing the HMTA or its implementing regulations. 49 U.S.C. § 5125(a)(1)–(2). However, the HMTA's preemption section contains an exception that leaves room for states to impose certain fees—the fair-fee provision. 49 U.S.C. § 5125(f). Under the HMTA's fair-fee provision, "[a] State . . . may impose a fee related to transporting hazardous material only if the fee is fair and used for a purpose related to transporting hazardous material, including enforcement and planning, developing, and maintaining a capability for emergency response." *Id.*

### 1. Fair Fees

First, the Association first argues that the Minnesota assessment is preempted because it is not a "fair" fee. Pl.'s Mem. 14. The Association contends that a fee for transportation of hazardous materials "is not 'fair' under the HMTA if it imposes burdens on rail carriers that it does not impose on competing modes of freight transportation," and Defendants admit that the assessment does not apply to trucks, ships, or barges. *Id.* at 14, 15. The Court finds this argument unpersuasive.

As an initial matter, there is no argument before the Court that on the face of the pleadings it would be impossible to comply with both the Minnesota assessment and the HMTA, or any regulation under the HMTA. 49 U.S.C. § 5125(a)(1). Nor has AAR demonstrated that the Minnesota assessment itself constitutes an obstacle to accomplishing and carrying out the HMTA's purposes or its implementing regulations. 49 U.S.C. § 5125(a)(2).

In addition, AAR fails to direct the Court to any case in which a court determined that a state fee was not "fair" on a motion to dismiss under Rule 12(b)(6). AAR relies principally on the Ninth Circuit's decision in *BNSF Railway Co. v. California Department of Tax and Fee Administration*, 904 F.3d 755 (9th Cir. 2018) ("*CDTFA*") to support its position. But the *CDTFA* decision reflects an appellate court's determination on a much more developed record than the limited allegations currently before this Court. In *CDTFA*, the Ninth Circuit affirmed a district court's preliminary injunction barring enforcement of a California law that imposed a fee on railroads but not on the trucking industry. *Id.* at 765. The district court reached that conclusion after conducting a fact-intensive analysis that would be ill-suited for resolution on a motion to dismiss, and the appellate decision confirms this. For example, the *CDTFA* court relied on an expert declaration establishing "that railroads and trucks transport roughly equivalent amounts of hazardous materials on a ton-mile basis" and that the "risks, and associated costs, of hazardous materials spills are substantial for both rail and trucking." *Id.* at 766. There is nothing in the record before the Court here that would allow it to find such facts at this stage. In addition, the *CDTFA* court reached its conclusions based on information regarding the relative frequency and harms from trucking and rail accidents. *See id.* at 767. There is an entirely undeveloped record on similar matters here, and the Court does not read *CDTFA* to stand for the proposition that a state law imposing a fee is necessarily unfair just because it reflects different treatment between two industries engaged in transporting hazardous materials. Accordingly, the Court finds that *CDTFA* does not support dismissal of the Counterclaims and the Third-Party Complaint.

Second, the Association argues that the assessment is not a "fair" fee because it imposes costs on the railroads even if they do not carry hazardous materials at all and without regard to the quantity of hazardous materials each railroad transports. Pl.'s Mem. 16. However, the Court finds these arguments address factual issues that are not appropriate for resolution on a motion to dismiss. The pleadings allege that the railroads carry hazardous materials in Minnesota and, in fact, that they are required to do so as common carriers. Compl. ¶ 20; Ans. ¶ 20. Given the parties' agreement in the pleadings that AAR's members transport hazardous material, it is too speculative (and requires the Court to draw inferences in favor of the moving party) to hypothesize that a rail carrier that does not transport any hazardous materials will be subject to the Minnesota assessment. And while the statute does not use a volume-of-hazardous-materials metric to determine individual rail companies' proportionate share of the assessment, AAR points to no authority indicating that doing so would be the only way that a fee could be deemed "fair" under the HMTA's fair-fee provision. The Court agrees with the Commissioners that the record is insufficiently developed to determine whether the statute's method of using track mileage constitutes a "fair" basis on which to impose the fee on individual railroads.[5]

---

[5] The Association states that railroads pay an annual fee to the PHMSA to fund state-based hazardous materials training and response and that Class I railroads spend millions in voluntarily providing hazardous materials training and equipment to state-based emergency responders. But the Association does not explain the relevance of this fact. Nor is there any allegation in the pleadings properly before the Court concerning the Association's members' voluntary spending.

### 2.  Purpose for Which a Fee is Used

Finally, the Association argues that the assessment is preempted under the HMTA because it does not require Minnesota to use the funds collected "for a purpose related to transporting hazardous material." Pl.'s Mem. 17. Once again, the Court disagrees that dismissal of the Defendants' Counterclaim and the Third-Party Complaint based on HMTA preemption is appropriate on this issue at this stage.

There are three state "accounts" relevant to the parties' arguments—the "railroad and pipeline safety account," the "grade crossing safety account," and the "trunk highway fund." Minn. Stat. § 299A.55 establishes the railroad and pipeline safety account, which "consists of funds collected under" the assessment. *Id*. subd. 2(a). The State annually appropriates a portion of the revenue from the railroad and pipeline safety account to the commissioner of the Minnesota Pollution Control Agency "for environmental protection activities related to railroad discharge preparedness. . . ." *Id*. subd. 2(b).

Each year a portion of the funds in the railroad and pipeline safety account are "transferred . . . to the grade crossing safety account under section 219.1651." *Id*. subd. 2(c). Once that portion of the funds are appropriated from the railroad and pipeline safety account to the grade crossing safety account, "the remaining money in the [railroad and pipeline safety] account is annually appropriated to the commissioner of public safety" for certain specified purposes. *Id*. subd. 2(d). These purposes include "training and response preparedness related to (1) derailments, discharge incidents, or spills involving trains carrying oil or other hazardous substances, and (2) pipeline discharge incidents or spills involving oil or other hazardous substances." *Id*. subd. 3(a). And "[i]f the balance

of the [railroad and pipeline safety] account at the end of a fiscal biennium is greater than $2,000,000, the amount above $2,000,000 must be transferred to the grade crossing safety account under section 219.1651." *Id.* subd. 2(f).

The funds in the grade crossing safety account are "appropriated to the commissioner of transportation for rail-highway grade crossing safety projects on public streets and highways, including engineering costs and other costs associated with administration and delivery of grade crossing safety projects." Minn. Stat. § 219.1651. The statute discussing the grade crossing safety account also provides that the commissioner of transportation has the discretion to "cancel" funds in the grade crossing safety account "to the trunk highway fund" at the end of each biennium. *Id.* As the Commissioners admit in their Answer, the trunk highway fund "is not used for any rail-related purpose. . . ." Ans. ¶ 30.

Contrary to the Association's argument,[6] the statutory language and the pleadings do not make it clear that the Minnesota assessment is preempted by the HMTA. The Association bears the burden of showing that preemption applies, and they have not persuaded the Court, on this record, that the fees received by the State pursuant to the assessment are not "used for a purpose related to transporting hazardous material." 49 U.S.C. § 5125(f). Purposes related to transporting hazardous material include "enforcement and planning, developing, and maintaining a capability for emergency response." *Id.* And the Minnesota law explicitly provides that the funds at issue may

---

[6] In their briefing concerning HMTA preemption, neither side has cited cases interpreting and applying § 5125(f)'s requirement that a fee be "used for a purpose related to transporting hazardous material." The Court's own research at this stage has identified no such caselaw.

permissibly be used in ways that are related to transportation of hazardous materials. *See* Minn. Stat. § 299A.55, subd. 3(e). These include training costs, costs of equipment related to readiness for hazardous materials incidents, supplies, costs for emergency response teams, and emergency exercises. And nothing in the state laws concerning the grade crossing safety account and the trunk highway fund dictate that the funds must be used for purposes bearing no relationship to transporting hazardous materials.[7] The Minnesota law relating to these two accounts does not explicitly require the commissioner of transportation to move any funds from the grade crossing safety account to the trunk highway fund, but rather, leaves the decision whether to do so to the transportation commissioner's discretion.

Moreover, the HMTA requires a fee to be fair and to be "*used* for a purpose related to transporting hazardous material." 49 U.S.C. § 5125(f) (emphasis added). AAR suggests that the relevant question for purposes of applying the HMTA's exception to preemption in paragraph (f) is how the funds obtained from the fee *could be used* because once the fee has been collected and spent by the state, that would be too late for AAR's members to do anything about the improper collection. Pl.'s Reply 13–14. But the HMTA does not plainly convey congressional intent that a state law is preempted on its

---

[7] In arguing that the Minnesota assessment runs afoul of the purpose requirement of the HMTA's fair-fee provision, AAR states that the "HMTA does not permit a State to spend millions of dollars in railroad fee revenue on purposes that are not related to *railroads'* transportation of hazardous material." Pl.'s Mem. 17 (emphasis added). But this argument conflates the concepts of fairness and permissible purpose that does not flow from the plain language of the HMTA's fair-fee provision. That provision requires a fee to be "fair" and "used for a purpose related to transporting hazardous material." 49 U.S.C. § 5125(f). It does not say that a fee is only used for a permissible purpose when a state specifically dedicates every penny of the payor's fee to its own sector of the transportation industry.

face simply because there is a possibility of how a state may use the collected fee. The HMTA allows fair fees that are, in fact, used for a purpose related to transporting hazardous material. And it is far from obvious that AAR's members would have no method to recoup an assessment that was actually used for a purpose unrelated to transporting hazardous material.

Finally, AAR points to certain admissions in the Commissioners' Answer regarding the purposes of the grade crossing safety account and the trunk highway fund. Specifically, AAR asserts that "[b]y the State's admission, the Commissioner of the Department of Public Safety is empowered to use the money for more general purposes, . . . exactly what the HMTA forbids." Pl.'s Mem. 17 (cleaned up). But AAR does not accurately capture what Defendants admitted in their Answer. AAR's Complaint alleges, and Defendants admit, only that amounts in the railroad and pipeline safety account "serves more general purposes" than "for activities specifically related to railroad and pipeline safety." Compl. ¶ 28; Ans. ¶ 28. And the Commissioners admit that the grade crossing safety account is not used exclusively for rail-highway crossing safety projects. Compl. ¶ 30; Ans. ¶ 30. These are far from clear admissions that the funds collected pursuant to the Minnesota assessment cannot and will not be "used for a purpose related to transporting hazardous material." 49 U.S.C. § 5125(f).

In sum, the Court cannot conclusively determine at this stage of the proceedings that the Minnesota assessment fails to meet the HMTA's requirement that a fair fee must be used for a purpose related to transportation of hazardous materials.

## C. ICCTA

In 1995, Congress passed the Interstate Commerce Commission Termination Act to eliminate the Interstate Commerce Commission, which regulated railroad and trucking for more than 100 years, and replace it with the Surface Transportation Board. *BNSF Ry. Co. v. Clark Cnty., Washington*, 11 F.4th 961, 963 (9th Cir. 2021) ("With the passage of the ICCTA, 'Congress abolished the Interstate Commerce Commission, revised the Interstate Commerce Act, and transferred regulatory functions under that Act to the Surface Transportation Board.'") (quoting *DHX, Inc. v. Surface Transp. Bd.*, 501 F.3d 1080, 1082 (9th Cir. 2007)) (cleaned up).

### 1. ICCTA's Preemption Provision

In part, the ICCTA provides that the Surface Transportation Board has exclusive jurisdiction over

> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State.

49 U.S.C. § 10501(b). Further, the statute states that "Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." *Id.* Courts have acknowledged that ICCTA's preemption provision is broad. *Iowa, Chicago & E. R.R. Corp. v. Wash. Cnty.*, 384 F.3d 557, 559 (8th Cir. 2004); *CDTFA*, 904

F.3d at 760; *Clark Cnty.*, 11 F.4th at 966. It is not, however, unlimited. *Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 104 (2d Cir. 2009) ("We think it important to emphasize that although ICCTA's pre-emption language is unquestionably broad, it does not categorically sweep up all state regulation that touches upon railroads—interference with rail transportation must always be demonstrated.").

### Categorical Preemption

"Congress narrowly tailored the ICCTA pre-emption provision to displace only 'regulation,' i.e., those state laws that may reasonably be said to have the effect of 'managing' or 'governing' rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation." *Franks Inv. Co. LLC v. Union Pac. R. Co.*, 593 F.3d 404, 410 (5th Cir. 2010) (quoting *Fla. E. Coast Ry. Co. v. City of W. Palm Beach,* 266 F.3d 1324, 1331 (11th Cir. 2001)) (cleaned up); *see also Delaware v. Surface Transp. Bd.*, 859 F.3d 16, 18 (D.C. Cir. 2017). When a state or local regulation manages or governs rail transportation, the ICCTA categorically preempts it and "the focus is the act of regulation itself, not the effect of the state regulation in a specific factual situation." *Delaware*, 859 F.3d at 19. The ICCTA "defines rail transportation expansively to encompass any property, facility, or equipment related to the movement of passengers and property by rail and any related services, including 'receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property.'" *City of Lincoln v. Surface Transp. Bd.*, 414 F.3d 858, 861 (8th Cir. 2005) (quoting 49 U.S.C. § 10102(9)). "Notwithstanding the 'expansive' definition of transportation, all of the circuits have

concluded that it 'does not encompass everything touching on railroads.'" *Delaware*, 859 F.3d at 18 (quoting *Emerson v. Kan. City S. Ry. Co.*, 503 F.3d 1126, 1129 (10th Cir. 2007), and collecting cases).

### *As-Applied Preemption*

Some laws that are not categorically preempted may nevertheless be preempted "as applied." Even when a state statute or regulation is not categorically preempted, they "may still be impermissible if, as applied, they would have the effect of unreasonably burdening or interfering with rail transportation." *Delaware*, 859 F.3d at 19 (citing *Franks Inv. Co. LLC*, 593 F.3d at 414). As-applied preemption depends on "the degree of interference that [a state or local law] has on railroad transportation[.]" *Wedemeyer v. CSX Transp., Inc.*, 850 F.3d 889, 894 (7th Cir. 2017). A "claim is preempted . . . if the requested remedy will, in the words of the STB's governing test, 'impede rail operations or pose undue safety risks." *City of Ozark, Arkansas v. Union Pac. R.R. Co.*, 843 F.3d 1167, 1172 (8th Cir. 2016). This is a fact-specific analysis. *Tubbs v. Surface Transportation Board*, 812 F.3d 1141, 1144 (8th Cir. 2015).

### 2.  Analysis

AAR argues that the ICCTA preempts the Minnesota assessment both because the state law governs rail transportation and because it discriminates against railroads. As explained below, the Court finds that AAR has failed to show it should prevail on its preemption arguments based on the pleadings alone.

### *Governing Rail Transportation*

Start with the Plaintiff's assertion that the Minnesota assessment governs rail transportation.[8] The relevant questions here are: "what does the state seek to regulate and does the proposed regulation burden rail transportation?" *Island Park, LLC*, 559 F.3d at 103. Section 299A.55, subd. 4 does not facially manage or govern "rail transportation"— in other words, "any railroad property, facility, or equipment related to the movement of property." *City of Lincoln*, 414 F.3d at 861 (quoting the definition of rail transportation in 49 U.S.C. § 10102(9)). Nor does it obviously regulate any of the "related services, including 'receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property.'" *Id.* The lack of a facial connection between the assessment's charge to the railroads and any management or governance of railroad property or related services takes the assessment's imposition outside the ICCTA's definition of "transportation."

The burden imposed on the railroads by the Minnesota assessment is also unlike those at issue in other cases where courts have found state regulations to be expressly or categorically preempted. For example, in *City of Palestine*, the court found an agreement that required the railroad to employ a certain percentage of its office and shop employees who repaired empty cars and processed complaints and claims for freight damage within the city itself was expressly preempted because the "Agreement manages and governs

---

[8] The Court understands AAR's argument that the Minnesota assessment governs rail transportation to be an assertion that the state law is categorically preempted.

facilities or services related to the movement of passengers or property by rail." 41 F.4th 696, 705 (5th Cir. 2022).[9]

Similarly, in *Delaware*, the court found a state law preempted because it affected how and when trains could move through certain areas. 859 F.3d at 21. As the *Delaware* court explained, the law at issue "directly regulates rail transportation by prohibiting locomotives from idling in certain places at certain times, in essence requiring that at night, in residential neighborhoods, they either shut down or keep moving. . . . This is a regulation of rail transportation under the ICCTA[.]" *Id.*

Another example is *Soo Line Railroad Co. v. City of St. Paul*. 827 F. Supp. 2d 1017 (D. Minn. 2010), where the court found a city's proposed condemnation of a strip of land next to an active railway was preempted. *Id.* at 1021–22. The court explained its reasoning as follows: "Given that the definition includes the term 'property,' the City's proposed condemnation of the 24-foot wide strip of the right-of-way falls squarely within the definition 'transportation' as defined by 49 U.S.C. § 10102(9)." *Id.* at 1021; *see also id.* at 1022 ("Because the City's proposed condemnation seeking a permanent easement would be an act seeking to control CP's property, it is a form of regulation.").

The Minnesota assessment here at issue is not plainly comparable to these other preempted requirements. It does not, on the face of the statute, seek to manage or govern any railroad property or facility related to the movement of passengers or railroad property, and it does not facially manage or govern related services. It does not dictate

---

[9] "A facility is a structure designed to house specific operations, and not an improvement to the tracks that allows them to be crossed by traffic." *Island Park*, 559 F.3d at 103 n.9.

where a railroad is permitted to house its facilities for conducting repairs on its cars, or where it can employ its agents responsible for fielding passenger concerns. It does not mandate when and where, or under what conditions, trains may pass through any place within the state. The assessment does not control any railroad property, such as a right of way, by regulation. As a result, on the face of the statute, the Court cannot conclude that AAR has shown the Minnesota assessment manages or governs rail transportation.

In its reply, AAR suggests that a finding of preemption is compelled by the Eighth Circuit's decision in *Tubbs v. Surface Transportation Board*. 812 F.3d 1141. The Court disagrees. In *Tubbs*, the plaintiffs were farmers who brought state law tort claims against BNSF and its contractor seeking damages arising out of allegedly shoddy structural work in raising embankments running across the plaintiffs' farm that led to excessive flooding and erosion of the farm's fertile soil. *Id.* at 1143. The *Tubbs* court denied the farmers' petition for review of the STB's preemption decision, finding that substantial evidence supported the STB's conclusion because the plaintiffs' claims directly challenged the railroad's acts of "designing, constructing, and maintaining an active rail line—actions that are part of transportation by rail carriers. *Id.* at 1146. However, unlike AAR's categorical preemption challenge here, *Tubbs* involved application of the STB's "fact intensive" test for analyzing unreasonable burdens or interference with rail transportation in an as-applied analysis. *Id.* at 1144–45. Moreover, AAR does not meaningfully compare the way in which the claims at issue in *Tubbs* impacted rail transportation to the effect of the Minnesota assessment on any railroad operations. Instead, AAR opts for cherry-picking a few words from the Third-Party Complaint that concern the

Commissioner's general position as to how the railroads have elevated profits over safety considerations. *See* Pl.'s Reply 5 (citing Doc. 29 ¶¶ 14–15, 26–27, 37). Those allegations in the Third-Party Complaint do not demonstrate that the Minnesota assessment would govern or manage anything like how railroads manage or maintain their rail property.

Further, AAR contends that the assessment has the effect of managing or governing rail transportation because it imposes more than a remote or incidental effect on rail transportation. Pl.'s Mem. 12. However, the degree to which the Minnesota assessment affects rail "transportation" as that term is defined by ICCTA is a factual dispute. AAR fails to cite a single case where a court has granted a motion to dismiss on preemption grounds because a state law that does not itself govern or manage rail transportation has an unreasonable effect on rail transportation.[10]

### *Discriminates Against Rail Carriers*

Finally, AAR argues that ICCTA preempts the Minnesota assessment because it discriminates against rail transportation by imposing the assessment on railroads, but not on other industries (e.g., trucking, shipping, or barge transportation) that also move hazardous material within and across Minnesota. Pl.'s Mem. 13. The Court finds that this argument presents a fact intensive inquiry that cannot be resolved on the present record

---

[10] In its reply, AAR asserts that a "municipal ordinance that raises a railroad's monthly sewer rate from $27.42 per month to $350 per month is preempted." Pl.'s Reply 4. But the case AAR cites—*BNSF Railway Co. v. Town of Cicero*, 592 F. Supp. 3d 716 (N.D. Ill. 2022)—doesn't support that proposition. Rather, the *Town of Cicero* court declined to grant *the city's* motion to dismiss the railroad's declaratory judgment preemption claims because the railroad adequately alleged that the sewer ordinance was a regulation of railroad transportation. *Id.* at 729.

for reasons similar to those explored above with respect to discrimination under the 4-R Act and the fair-free provision of the HMTA.[11]

**ORDER**

For the reasons set forth above, **IT IS HEREBY ORDERED THAT** Plaintiff Association of American Railroads' and Third-Party Defendants' Motion to Dismiss Counterclaims and Third-Party Complaint (Doc. 46) is **DENIED**.

Date: December 11, 2024                    *s/Katherine Menendez*
                                           Katherine Menendez
                                           United States District Judge

---

[11] In support of its argument that the ICCTA preempts state laws that discriminate against railroads or target the railroad industry, the Association principally relies on the Third Circuit's decision in *N.Y. Susquehanna and Western Railway Corp. v. Jackson*, 500 F.3d 238 (3rd Cir. 2007). Assuming that *Jackson* represents the correct view of the law, it illustrates the insufficiency of the record here. Indeed, the *Jackson* court vacated the district court's permanent injunction against enforcement of New Jersey's efforts to regulate the transloading of solid waste from trucks to railroad cars and remanded the matter to the district court because its "factfinding does not support its conclusion that all of the State's environmental regulations at issue are preempted here, [and] for consideration of each regulation individually." *Id.* at 242.