**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| Association of American Railroads,<br><br>Plaintiff,<br><br>vs.<br><br>Bob Jacobson, Commissioner of the Minnesota Department of Public Safety, Paul Marquart, Commissioner of the Minnesota Department of Revenue,<br><br>Defendants. | Case No. 0:24-CV-01522-KMM/SGE<br><br>**DEFENDANT COMMISSIONERS'<br>MEMORANDUM OF LAW<br>OPPOSING MOTION TO<br>EXCLUDE TESTIMONY OF<br>MARK D. ABKOWITZ** |
| Bob Jacobson, Commissioner of the Minnesota Department of Public Safety,<br><br>Third-Party Plaintiff,<br><br>vs.<br><br>BNSF Railway Company, Wisconsin Central Ltd., Cedar River Railroad Company, Soo Line Railroad Company, and Union Pacific Railroad,<br><br>Third-Party Defendants. | |

1

## INTRODUCTION

The Commissioners' expert, Dr. Mark Abkowitz, is a preeminent expert in hazardous materials transportation, risk, and emergency response. The American Association of Railroads ("AAR") and third-party defendant railroads (collectively referred to as AAR) do not dispute Dr. Abkowitz's qualifications or expertise. Instead, they rely on theoretical objections and a statistician (who is admittedly *not* an expert in hazardous materials transportation or emergency response) to nitpick Dr. Abkowitz's methodology and assumptions. Because those objections go to the weight the Court should provide Dr. Abkowitz's opinion, and not its fundamental admissibility under the pro-admission standards of Rule 702, the Court should deny AAR's motion, consider Dr. Abkowitz's report at summary judgment, and (if necessary) allow Dr. Abkowitz's testimony at the bench trial in this matter.

## BACKGROUND

**I.   DR. MARK ABKOWITZ IS AN EXPERT IN HAZARDOUS MATERIALS TRANSPORTATION SAFETY AND RESPONSE.**

Dr. Mark. D. Abkowitz holds an appointment as Distinguished Professor of Civil & Environmental Engineering at Vanderbilt University.[1] He holds B.S., M.S., and Ph.D. degrees in Civil Engineering from the Massachusetts Institute of Technology.[2] He is a specialist in hazardous materials transportation safety and security, enterprise risk assessment, management and communication who has authored several hundred

---

[1] Decl. of Oliver Larson ("Larson Dec."), Ex 1.
[2] *Id.*

publications related to these topics.[3] Dr. Abkowitz has also authored two books on risk management: *Operational Risk Management – A Case Study Approach to Effective Planning and Response* and *The World According to Humpty Dumpty: The New Normal of Managing Risk*.[4]

Dr. Abkowitz has been nationally recognized for his work in hazardous materials transportation specifically.[5] He was appointed to the Nuclear Waste Technical Review Board by President George W. Bush.[6] His professional accolades related to hazardous materials transport include the Distinguished Service Award from the National Academies of Science for his leadership role with the Transportation Research Board and the Charles H. Hochman Lifetime Achievement Award for contributions to hazardous materials transportation research.[7] Dr. Abkowitz has been inducted into the American Academy of Environmental Engineers as a Board-Certified Member.[8] In short, his distinguished career and life's work in hazardous materials transportation safety establish Dr. Abkowitz as a preeminent expert in the field of hazardous materials transportation and response —and *the* preeminent expert on the issues in this case.

## II.   DR. ABKOWITZ'S METHOD AND CONCLUSIONS.

The Commissioners retained Dr. Abkowitz to opine on the relative risks and burdens of hazardous materials incident response amongst rail, pipeline, truck, and waterborne

---

[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *Id.*

transport.[9] To do so, Dr. Abkowitz undertook a fairly standard method: He determined relevant datasets, set limits around time and geography to restrict the data, used information available in one dataset to impute the relevant information to other sets, and then performed qualitative analysis on that data to come to a conclusion about relative response costs. *Id.* at 11-25.

Dr. Abkowitz started, uncontroversially, with data from the U.S. Pipeline and Hazardous Materials Safety Administration (PHMSA), which collects known and reimbursed public expenditures for emergency response to certain types of hazardous materials incidents.[10] But Dr. Abkowitz also noted that the Special Assessment funds training and response preparedness for more than just PHMSA-qualifying incidents—namely, derailments or collisions that involve any train carrying hazardous material (that may not result in an actual release of hazardous material).[11] So, Dr. Abkowitz identified and included data maintained by other governmental agencies regarding incidents, filtering specifically for incidents that included hazardous materials for which an emergency response, as contemplated by the Special Assessment, would be required.[12]

For rail transport, Dr. Abkowitz included incident records maintained by the Federal Railroad Administration ("FRA").[13] He filtered that dataset to include only derailments where a hazardous materials car was present, or other incidents where a hazardous

---

[9] Decl. of Andrew W. Davis, Dkt. 111-1, Ex. A ("Abkowitz Report") at 5.
[10] *Id.* at 10-11.
[11] *Id.* at 13-15; *see also* Minn. Stat. §§ 299A.55, subds. 1(e) and 3(a)(1).
[12] *Id.* at 12-15.
[13] *Id.* at 12.

materials car was damaged or involved a release.[14] Dr. Abkowitz joined the two datasets using a PHMSA-recommended methodology, identified overlapping incidents, and, because the FRA does not collect response costs, imputed response costs to the FRA data using the average of the PHMSA and FRA overlapping incidents. *Id.* at 13-14. Dr. Abkowitz used similar methodology to include additional incidents for the three other modes of transport and impute costs in a similar fashion. *Id.* at 13-15. He similarly imputed response costs for the other three modes based on overlapping incidents from the PHMSA and supplementary data sets. *Id.*

Dr. Abkowitz made two selection decisions on his dataset, both informed by his expertise in hazardous materials transport. First, Dr. Abkowitz limited the data he analyzed to a five-year period from 2020-2024.[15] That is because, in his expert opinion, older data can be unreliable because of changes in infrastructure, traffic patterns, safety regulations, and technology.[16] Second, Dr. Abkowitz used a nationwide sample, rather than a Minnesota-only sample, based on his informed opinion that hazardous materials transporters typically operate in the same across multiple states, and that a national scope "more accurately represents the risks associated with each mode of transport."[17]

Using that combined data and methodology, Dr. Abkowitz concluded the following response costs by mode of transport:[18]

---

[14] *Id.* at 13.
[15] *Id.* at 11.
[16] *Id.*
[17] *Id.*
[18] *Id.* at 16.

Table 1. Hazardous Materials Incident Response Costs by Mode of Transport (2020-2024)

| Transport Mode | Incidents (#) | Incidents (%) | Response Costs ($M) | Response Costs (%) |
|---|---|---|---|---|
| Rail | 3,239 | 2% | 1470.80 | 64% |
| Pipe | 2,498 | 2% | 720.44 | 32% |
| Truck | 127,459 | 96% | 93.85 | 4% |
| Water | 98 | 0%[6] | 0.34 | 0% |

However, Dr. Abkowitz noted that not all response costs are equal to state and local entities.[19] So, he went one step further, apportioning the relative share of those costs attributable specifically to required state and local response.[20] Dr. Abkowitz relied heavily on his expertise in hazardous materials transportation and his deep knowledge of the Emergency Response Guidebook, the National Incident Management System, and Incident Command System structures to assess factors that impact how much effort state and local officials must undertake in different types of incidents.[21] Dr. Abkowitz identified seven different factors, and then used his expertise to weigh each factor's impact on state and local response, explaining his rationale for the weight he assigned.[22] Finally, Dr. Abkowitz normalized all relative resource expenditure ratios and multiplied those by the cost percentage breakdown to determine what proportion of state and local resources should be apportioned to each mode of transportation based on expected response costs.[23] That calculation resulted in the following proportions:[24]

---

[19] *Id.* at 24.
[20] *Id.* at 24-25.
[21] *Id.* at 18-22.
[22] *Id.* at 22.
[23] *Id.* at 24.
[24] *Id.* at 25.

6

- Rail = 73.9%

- Pipeline = 24.6%

- Truck = 1.5%

- Marine = 0%

Finally, Dr. Abkowitz undertook a "best practice" in risk assessments: He performed a sensitivity analysis to test whether changing or eliminating some of his qualitative assumptions significantly impacted his conclusions.[25] The sensitivity analysis essentially guards against bias in Dr. Abkowitz's subjective analysis—if he has weighted some criteria incorrectly, would the results change? Dr. Abkowitz found that the results did not change significantly, even while removing criteria he had weighed very high.[26]

## III.   AAR'S REBUTTAL EXPERT IS NOT A HAZARDOUS MATERIALS TRANSPORTATION EXPERT.

To undermine Dr. Abkowitz's report and opinion, AAR retained Dr. Scott Carr to provide expert testimony in this case.[27] Dr. Carr is a Senior Managing Director with Ankura Consulting Group, "a global consulting firm" with "several thousand professionals" that perform a "wide range of advisory consulting and expert analysis and expert testimony."[28] Dr. Carr works in the "area" of "expert analysis and expert testimony" and his "primary

---

[25] *Id.* at 25.
[26] *Id.* at 26.
[27] Exhibits to the Decl. of Andrew W. Davis, Dkt. 111-1 at Ex. C (Carr Rebuttal) at 1.
[28] Exhibits to the Decl. of Andrew W. Davis, Dkt. 111-1 at Ex. D (Carr Report), at 29; Larson Dec. Ex. 2 ("Carr Tr.") 26:4-13.

expertise" is "data analytics, modeling, [and] statistics," and "not in the area of emergency response."[29]

Dr. Carr does not have any "specific experience analyzing hazardous materials preparedness . . . [o]r response."[30] Though he references the Emergency Response Guidebook[31] in his reports, he only had "a vague memory of seeing it."[32] He is "not generally familiar with" the National Incident Management System or the local emergency response roles and responsibilities for hazardous materials transportation incidents is "generally not part of [Dr. Carr's] expertise."[33] Even the basic concept of interagency "mutual aid" employed by communities impacted by hazardous materials incidents is a term Dr. Carr only "know[s] in a non rigorous fashion."[34] In short, Dr. Carr is not, and does not purport to be, an expert in hazardous materials transportation, safety, or response.

## LEGAL STANDARD

Federal Rule of Evidence 702 governs admissibility of expert testimony. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

---

[29] Carr. Tr. 26:7-13, 150:20-25, 151:1.

[30] Carr Tr. 86:18-87:1.

[31] The Emergency Response Guidebook "is essentially the Bible for the emergency response community" and the National Incident Management System because it is a is "a critical tool for first responders during the initial phase of a hazardous materials transportation incident." Abkowitz Tr. 44:2-12; Abkowitz Report at 17.

[32] Carr Tr. 147:16-17.

[33] Carr Tr. 148:7-10.

[34] Carr Tr. 150:3-5.

(b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony," and "the rule clearly is one of admissibility rather than exclusion." *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (quotations omitted).

In *Daubert v. Merrell Pharmaceuticals, Inc.*, the Supreme Court noted the district court's "gatekeeping" role in the admission of expert testimony. 509 U.S. 579, 597, 113 S. Ct. 2786, 2798, 125 L. Ed. 2d 469 (1993). Importantly, however, this case would be tried to the Court as a bench trial—not a jury trial. This posture is significant, as courts apply "a more 'relaxed application [of *Daubert*] for bench trials.'" *Am. Dairy Queen Corp. v. W.B. Mason Co.*, 543 F. Supp. 3d 695, 721 (D. Minn. 2021) (quoting *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012) (citation omitted), *cert. denied*, 568 U.S. 888, 133 S.Ct. 364, 184 L.Ed.2d 160 (2012). Indeed, under *Daubert*, "the cornerstone for admissibility is assistance to the trier of fact." *Id.* (citing *Larson v. Kempker*, 414 F.3d 936, 940–41 (8th Cir. 2005)). And when the Court "sits as the finder of fact . . . there is 'less need for the gatekeeper to keep the gate[.]'" *Id.* (quoting Watson, P.C., 668 F.3d at 1015).

The "proponent of the expert testimony must prove its admissibility by a preponderance of the evidence." *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). But "[d]oubts regarding the usefulness of an expert's testimony should be resolved

9

in favor of admissibility." *Am. Dairy Queen Corp.*, 543 F. Supp. 3d at 721. Rather than excluding challenged but admissible expert testimony, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" to test the experts' opinions, particularly when the Court itself will serve as the ultimate trier of fact. *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786; *see also In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011) (distinguishing bench trials and jury trials and noting the "less stringent application of *Daubert* in bench trials").

## ARGUMENT

Dr. Abkowitz is, unquestionably and uncontested by AAR, a preeminent expert in hazardous materials transportation, risk, and response. That expertise makes his opinion on the relative response costs to different transportation modes' hazardous materials incidents an invaluable part of this case. AAR's motion to exclude Dr. Abkowitz's opinion deals in issues of weight and credibility—not admissibility. The Court should therefore (1) consider Dr. Abkowitz's report in connection with the Commissioners' opposition to AAR's motion for summary judgment and (2) allow Dr. Abkowitz's expert testimony at trial.

## I.     DR. ABKOWITZ'S OPINION IS RELEVANT TO THE CENTRAL ISSUE IN THIS CASE.

AAR first argues that Dr. Abkowitz's opinion is irrelevant because he uses a nationwide dataset, rather than a Minnesota-only dataset.[35] But that argument both

---

[35] AAR Br., Dkt. 110 at 15-17.

undervalues Dr. Abkowitz's expertise in these issues and is keyed to the weight the Court should give Dr. Abkowitz's opinion, not its admissibility.

AAR does not contest that Dr. Abkowitz is a qualified expert in hazardous materials transportation (nor could it—his qualifications speak for themselves).[36] And Dr. Abkowitz explained that, based on his expertise, a nationwide dataset is appropriate and useful for determining response costs for hazardous materials incidents.[37] And, Dr. Abkowitz reasoned, restricting his analysis to any single state's data would result in a too-small dataset that would undermine accuracy and comparison. *Id.*[38] And, it is a methodological decision made by other experts in the field—including a former Director of Risk Engineering in the Safety and Operations Division of AAR, Chris Barkan.[39]

And—contrary to AAR's nitpicking of Dr. Abkowitz's deposition[40]—Dr. Abkowitz testified consistently on this point when pressed. He confirmed that a nationwide dataset

---

[36] *See* AAR Br., Dkt. 110.

[37] Abkowitz Report at 5 ("[A] national scope more accurately represents the risks associated with each mode of transport.").

[38] AAR and its expert deal with this problem by expanding the timeframe and narrowing the geographical scope of their data. Dkt. 110 at 21-22; Carr Rebuttal at 33-36. Dr. Abkowitz, however, proactively explained why—in his expert opinion—that choice is improper. Abkowitz Report at 5; *see also* Exhibits to Decl. of Andrew W. Davis, Dkt. 111-1 at Ex. F ("Abkowitz Rebuttal") at 9. Dr. Abkowitz's decisions about where to limit or expand the dataset he relies upon are informed by decades of work in hazardous materials transportation. *Supra* at Background § I. Dr. Carr's choices are supported by no such expertise. *Supra* at Background § III. That does not even amount to a battle of experts' credibility—and it is certainly no reason to exclude Dr. Abkowitz's opinion.

[39] Liu, Saat, and Barkan, *Freight-train derailment rates for railroad safety and risk analysis*, 98 Accident Analysis and Prevention 1 (2017); *see also* Jennifer Homendy, *Letter regarding special investigation of Norfolk Southern Railway* (Apr. 7, 2023) (discussing an investigation based on incidents across the nation).

[40] Indeed, in the very colloquy AAR quotes from, Dr. Abkowitz explains why nationwide data is appropriate: "But I can say that based on the fact that the railroads operate

was important "[b]ecause the railroad industry operates everywhere in a very ubiquitous way. So we would want to not isolate an analysis of a small subset of cases that may have occurred in Minnesota as being representative of what Minnesota faces . . . . Because . . . it's more a case of what's the likelihood that they could happen in general and how prepared you need to be for the possibility that something very serious could happen next time."[41] Indeed, Dr. Abkowitz testified that "every study" that he was familiar with that "tries to look at hazardous materials transportation safety implicitly assumes that operations of this type are ubiquitous across the country."[42]

AAR's arguments are also fundamentally disputes with the factual underpinnings of Dr. Abkowitz' opinions, which is not a basis for exclusion under *Daubert. Minnesota Supply Co. v. Raymond Corp.*, 472 F.3d 524, 544 (8th Cir. 2006) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility[.]); *Fair Isaac Corp. v. Fed. Ins. Co.,* 447 F. Supp. 3d 857, 869 (D. Minn. 2020) ("But disputes about the factual basis of an expert's testimony ordinarily are issues of credibility—not admissibility—of the expert's testimony.") *citing Sappington v. Skyjack, Inc.,* 512 F.3d 440, 450 (8th Cir. 2008). If national data is somehow unrepresentative of what is happening in Minnesota (a conjecture not established by AAR) that argument goes to the weight this Court should give to Dr. Abkowitz's opinions, not their admissibility.

---

everywhere, and they operate everywhere in much the same fashion, that the types of incidents and the scale of those incidents could occur in Minnesota just as easily as it could occur anywhere else." Larson Decl. Ex. 3, Abkowitz Tr. 123:12-17.

[41] Larson Decl. Ex. 3, Abkowitz Tr. 50:4-17.

[42] *Id.* at 115:5-9.

Moreover, AAR provides no reliable evidence for its conjecture that response costs may vary significantly from state to state. It cites to nothing in the public record, no documentation of which the Court could take judicial notice, no case law finding anything similar.[43] Instead, it provides one throwaway line from Dr. Carr's Rebuttal Report to support its entire argument.[44] But, as Dr. Carr himself concedes, Dr. Carr has *no* relevant expertise in any issue related to hazardous materials transportation or response.[45] So Dr. Carr's report, by its own terms, cannot "rebut" Dr. Abkowitz's opinion that hazardous materials transportation, particularly by rail, operates basically uniformly across the nation, risks are fairly uniform across the nation, and that a nationwide dataset is both relevant and useful to this analysis.

At best, AAR offers a theory contrary to Dr. Abkowitz's expert opinion—it hypothesizes that Dr. Abkowitz is wrong that the risks of hazardous materials incidents are generally the same across the country. But because it provides no evidence for its theory, that theory is best presented by cross-examination at trial. It is no basis to conclude that that decision is "so fundamentally unsupported" that it can offer no assistance, or to exclude Dr. Abkowitz's opinion in advance. *See Larson v. Kempker*, 414 F.3d 936, 941 (8th Cir. 2005) (quotation omitted).

---

[43] *See* Dkt. 110 at 21-22. AAR argues that safety regulations affecting hazardous materials transportation by rail may change between states (Dkt. 110 at 17)—an ironic position, given that the basis of AAR's lawsuit is that states cannot individually regulate rail due to federal law.

[44] Dkt. 110 at 17 ("In contrast, 'a Minnesota-specific analysis would . . . ensure that the results reflect any circumstances that are experienced in or important to Minnesota, but not most of the U.S.' Carr Rebuttal Report at 34.").

[45] Carr. Tr. 26:7-13, 150:20-25, 151:1.

## II.   DR. ABKOWITZ'S METHODS ARE RELIABLE, SUPPORTED, AND THE PRODUCT OF EXPERTISE.

Next, AAR attacks Dr. Abkowitz's opinions as, among other pejorative contentions, "rank speculation" and "ipse dixit" – essentially, an opinion that is not sufficiently reliable to be admitted.[46]  But, "[a]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Hose v. Chicago NW Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995) (internal quotations omitted) (citing *Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 570 (8th Cir. 1988); Fed. R. Evid. 703).  It is "only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Loudermill*, 863 F.2d at 570. Dr. Abkowitz's opinion easily clears that bar.

### A.  There Is No Reason To Reject Dr. Abkowitz's Use of Supplementary Data.

Start with AAR's objection to Dr. Abkowitz's use of supplementary data. That objection is incredibly generalized—while AAR calls the FRA and other data sources "inconsistently collected" with "dubious filtering criteria," it provides no reason either of those assertions is true.[47] On the other hand, Dr. Abkowitz provided a robust explanation of why it was important to look at other data sources: because the PHMSA database (which everyone agrees is the appropriate starting point) does not require data collection that maps onto the responses the Special Assessment funds.[48] That is why—as Dr. Abkowitz's report

---

[46] Dkt. 110 at 18.
[47] Dkt. 110 at 19.
[48] Abkowitz Report at 12-13.

notes—other federal risk assessments also combine databases for more comprehensive analysis of risk.[49]

To be sure, combining datasets inherently presents some challenges. But Dr. Abkowitz carefully explained those challenges, demonstrated an in-depth knowledge of the criteria and reporting requirements of all the databases he used, and explained how he addressed those challenges in his analysis (through de-duping and filtering).[50] This does not reflect an opinion that is "fundamentally unsupported" by underlying data. *Loudermill*, 863 F.2d at 570. Moreover, with respect to rail, it is a similar method to one used by PHMSA itself.[51]

And while AAR objects that Dr. Abkowitz's use of supplementary data increases the number of rail incidents at issue, it ignores that Dr. Abkowitz used similar supplementary data for *all* at-issue methods of transport. *Id.* at 13-15.

In short, Dr. Abkowitz's use of supplementary data is not novel, nor is it so facially inconsistent or reliable to render his resulting opinion inadmissible on that basis.

### B. Dr. Abkowitz Grounds His Imputed Values in Expertise and Established Methodology.

Nor does Dr. Abkowitz's use of imputed values on that supplementary data render his opinion admissible. The use of imputed values is a legitimate and widely recognized method for handling missing data.[52] So the Court should not—and AAR does not appear

---

[49] *Id.* at 13.
[50] *Id.* at 12-13.
[51] Abkowitz Report at 13.
[52] Larson Decl. Ex. 3, Abkowitz Tr. 69:13-19; 70:2-11. *See also, e.g.,* Seastrom, Kaufman, & Lee, *Appendix B: Evaluating the Impact of Imputations for Item Nonresponse*, Statistical

to argue otherwise—exclude Dr. Abkowitz's opinion solely on the basis that he used imputed values.

Rather, AAR takes issue with the specific method by which Dr. Abkowitz imputed values. Once again, AAR primarily relies on Dr. Carr's Rebuttal Report to assert that because the overlapping incident response cost average is higher than the PHMSA-only response cost average, that imputation must be fundamentally unsound.[53] From Dr. Carr's pure-data perspective, that might be a problem—but from Dr. Abkowitz's view as a hazardous materials transportation and safety expert, it is a feature, not a bug.

Dr. Abkowitz explained why the overlapping average was a better representation of response costs to state and local governments than the average of the PHMSA-only data—because "[m]any of the spills that are in the PHMSA data are tiny little spills in yards where they were required to report something but hardly anything happened."[54] In other words, the PHMSA database includes many, many spills for which no significant state or local response was required; while the FRA database includes incidents in which a Special Assessment-funded response would be required even though no PHMSA report would be.[55] As a result, that is the value Dr. Abkowitz used to impute costs into the FRA data. While AAR may disagree with, and may cross-examine Dr. Abkowitz on, that approach, it was a

---

Standards Program, National Center for Education Statistics (2012), available at https://nces.ed.gov/statprog/2002/appendixb.asp (last accessed Apr. 29, 2026).

[53] Dkt. 110 at 10, 19. Notably, while Dr. Carr criticizes the specifics of Dr. Abkowitz's imputation, he does not opine that imputation is an inappropriate methodological decision generally. *See* Carr Rebuttal.

[54] Abkowitz Tr. 67:9-12; *see also* 75:25-76:12.

[55] Abkowitz Tr. 78:20-79:12.

reasoned choice based on Dr. Abkowitz's expertise—not a "fundamentally unsupported" one. *Loudermill*, 863 F.2d at 570. Accordingly, it provides no basis to exclude Dr. Abkowitz's opinion on the relative response costs for hazardous materials incidents between various modes of transport.

### C. Dr. Abkowitz's Qualitative Analysis Methodology Is Common in Risk Analysis.

Finally, AAR objects to Dr. Abkowitz's opinion about how much effort, and relative share of the cost, state and local government must expend to respond to hazardous materials incidents between the different modes of transport—section 3 of his report. True—this section of Dr. Abkowitz's opinion is a qualitative, rather than simply quantitative, analysis. But qualitative analysis is not inherently unreliable, and Dr. Abkowitz's methods are grounded in his undisputed expertise and common to the field of risk analysis.

AAR complains that Dr. Abkowitz's numerical risk scores are invented "out of whole cloth," and accordingly, the entire qualitative analysis is unreliable ipse dixit that should be excluded.[56] They are nothing of the sort. Rather, Dr. Abkowitz grounds his qualitative risk analysis in areas well within his expertise: the National Incident Management System, Incident Command System, and PHMSA's Emergency Response Guidebook.[57] These resources guide emergency response nationally, and are firm bases upon which to base qualitative analysis.[58]

---

[56] Dkt. 110 at 15-16.
[57] Abkowitz Report at 17-21.
[58] Abkowitz Tr. 44:2-12; 102:7-16; 104:9-105:17.

Dr. Abkowitz cites extensively to PHMSA's guidance and the Emergency Response Guidebook throughout his report, clearly drawing from those documents and his (undisputed) knowledge of emergency response procedures to numerically "rank" risks.[59] Doing so is not "ipse dixit," but informed subjective analysis. Informed qualitative analysis of this type is not "novel"[60]; it is recognized as a legitimate field across a variety of disciplines.[61]

Expert testimony is also not inadmissible simply because it relies on the judgment of an expert. *See United States v. Ferguson*, No. 23-CR-203 (SRN/TNL), 2024 WL 1928776, at *7 (D. Minn. May 2, 2024) ("The Court finds that the need for the exercise of scientific judgment in the application of a reliable scientific methodology does not render the methodology inadmissible for the purposes of *Daubert*. Rather, whether or not the scientist exercised proper judgment goes to the weight of the evidence.) *citing United States v. Romano*, 794 F.3d 317, 333 (2d. Cir. 2015) (holding that subjectivity inherent in otherwise reliable methodologies does not render the methodology unreliable, but instead goes to the weight of the evidence rather than its admissibility); *Crowley v. Chait*, 322 F.

---

[59] Abkowitz Report at 17-24.

[60] AAR cherry picks the word "novel" from Dr. Abkowitz's deposition to attack the reliability of this methodology. But Dr. Abkowitz was clear in his deposition—it is not qualitative risk assessment or multi-criteria decision analysis that is novel, *see infra* fn. 9, but their use in the specific context of determining state and local response costs for hazardous materials transportation incidents. Larson Dec. Ex. 3, Abkowitz Tr. 110:1-14

[61] *See, e.g.,* Joanna E.M. Sale and Stephen Thielke, *Qualitative research is a fundamental scientific process*, 102 Journal of Clinical Epidemiology 129 (2018) (discussing using qualitative risk factors in medicine, including suicide risk factors and effectiveness of pain medication); Jayanath Ananda and Gamini Hearth, *A critical review of multi-criteria decision making methods with special reference to forest management and planning*, 68 Ecological Economics 2535 (2009) (discussing multi-criteria decision making in risk analysis in the forestry context).

Supp. 2d 530, 549 (D.N.J. 2004) ("That an expert injects personal judgment in the course of offering his testimony is hardly grounds for excluding that testimony. Judgments must inevitably be made in the use of loss reserve calculations, and no actuarial method is so accurate as to eliminate some use of subjective judgment in the estimation of future claims.")

Again, AAR relies on Dr. Carr to critique the qualitative section of Dr. Abkowitz's report. But Dr. Carr is not an expert in hazardous materials transportation risk—he is, fundamentally, a statistician. *Supra*, Background § III. While that may make Dr. Carr qualified to question some aspects of Dr. Abkowitz's math, it should not result in his opinion effectively overruling Dr. Abkowitz's specific expertise in analyzing the risk of various modes of hazardous materials transportation. The appropriate vehicle for AAR to challenge portions of Dr. Abkowitz's math is through cross-examination and presentation of contrary evidence, not by excluding his opinion.

* * * * *

Fundamentally, AAR's objections to Dr. Abkowitz's testimony go to how credible Dr. Abkowitz's conclusions may be—not their admissibility. That is an issue for cross-examination at trial, and not a reason to exclude Dr. Abkowitz's undisputed expertise in hazardous materials transportation at this early stage. *Larson*, 414 F.3d at 941 (holding that the district court abused its discretion by not admitting challenged expert testimony, noting the expert's academic credentials and extensive experience in the pertinent field).

## CONCLUSION

AAR's objections to Dr. Abkowitz's expert opinion are more properly directed to the weight and credibility of opinion, and not at its admissibility. Accordingly, Dr. Abkowitz's expert report should be considered at summary judgment, and his expert testimony allowed at trial.

Dated: May 6, 2026

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota


*s/ Oliver J. Larson*
OLIVER J. LARSON
Assistant Attorney General
Attorney Reg. No. 0392946

MATHEW FERCHE
Assistant Attorney General
Atty. Reg. No. 0391282

EMILY B. ANDERSON
Assistant Attorney General
Atty. Reg. No. 0399272

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1457 (Voice)
(651) 297-4077 (Fax)
mathew.ferche@ag.state.mn.us

*Attorney for Defendant and Third-Party Plaintiff Bob Jacobson, in his official capacity as Commissioner of the Minnesota Department of Public Safety and Defendant Paul Marquart, in his official capacity as Commissioner of Revenue*

20